[S.F. No. 23449. Mar. 22, 1977.]

DIANA D. SOLBERG et al., Petitioners, v.
THE SUPERIOR COURT OF THE CITY AND COUNTY OF SAN
FRANCISCO et al., Respondents;
THE PEOPLE, Real Party in Interest.

[S.F. No. 23469. Mar. 22, 1977.]

THE PEOPLE, Plaintiff and Respondent, v.
THE MUNICIPAL COURT FOR THE SAN FRANCISCO JUDICIAL
DISTRICT OF THE CITY AND COUNTY OF SAN FRANCISCO et
al., Defendants and Appellants;
DIANA D. SOLBERG et al., Real Parties in Interest and Appellants.

## COUNSEL

Gilbert Eisenberg, Filippelli & Eisenberg and Ruth Astle for Petitioners and for Real Parties in Interest and Appellants.

Thomas M. O'Connor, City Attorney, Burk E. Delventhal, Deputy City Attorney, and Michael Hallinan for Defendants and Appellants.

No appearance for Respondents.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, Edward P. O'Brien, Assistant Attorney General, Derald E. Granberg and John W. Runde, Deputy Attorneys General, for Real Party in Interest and for Plaintiff and Respondent.

Roger S. Hanson, H. George Taylor, Donald M. Solomon, Sheldon Portman, Public Defender (Santa Clara), Keith C. Sorenson, District Attorney (San Mateo), Douglas J. Gray, Deputy District Attorney, Herbert M. Rosenthal, Garrett H. Elmore, Irell & Manella, Robert L. Winslow and Peter M. Hoffman as Amici Curiae.

## OPINION

**MOSK, J.**—In *Johnson* v. *Superior Court* (1958) 50 Cal.2d 693 [329 P.2d 5], we held that Code of Civil Procedure section 170.6, which provides for the disqualification of trial judges on motion supported by an affidavit of prejudice, does not violate the doctrine of the separation of

powers or impair the independence of the judiciary. ▮▮▮ In these consolidated proceedings we are called upon to reconsider that decision in light of the experience with the statute during the intervening two decades and as applied here in a criminal context. We have undertaken that review, and conclude that the constitutionality of the statute should be reaffirmed.

Code of Civil Procedure section 170.6 provides in substance that any party or attorney to a civil or criminal action may make an oral or written motion to disqualify the assigned judge, supported by an affidavit that the judge is prejudiced against such party or attorney or the interest thereof so that the affiant cannot or believes he cannot have an impartial trial. As hereinafter appears, there are strict limits on the timing and number of such motions; but if the motion is timely and in proper form, the judge must recuse himself without further proof and the case must be reassigned to another judge.

The facts of these proceedings are not in dispute. On October 9, 1975, a criminal complaint charging Tina Peoples with soliciting an act of prostitution (Pen. Code, § 647, subd. (b)) came before Judge Ollie Marie-Victoire of the San Francisco Municipal Court. Defense counsel filed a motion to dismiss the charge, and asked for a hearing date. Judge Marie-Victoire set the matter to be heard in her own department on November 12, 1975. At that point Deputy District Attorney Edward Rudloff, representing the People, asked to be sworn and made an oral motion to disqualify Judge Marie-Victoire pursuant to Code of Civil Procedure section 170.6.[1] The judge declined to disqualify herself on the ground that the pending matter—i.e., the motion to dismiss the charge—presented the same issues of law and fact that she had adjudicated in similar prosecutions against other defendants a week earlier. Judge Marie-Victoire offered Rudloff the opportunity to challenge her for cause (Code Civ. Proc., § 170, subd. 5), but he declined.

On the same day criminal complaints charging Diana Solberg, Constance Black, and Javette Rollins with soliciting an act of prostitution also came before Judge Marie-Victoire. In each, defense counsel moved to dismiss; the judge set the matter for hearing in her own department on November 12; Rudloff summarily renewed his motion to disqualify; and the judge summarily denied it.

[1] The words of the oral motion were: "Pursuant to Section 170.6 of the California Code of Civil Procedure, the People don't feel we can get a fair trial in cases of these kinds in this court and ask that this Judge be challenged peremptorily."

On the following day (October 10) Rudloff filed a formal written motion under section 170.6 to disqualify Judge Marie-Victoire from hearing the foregoing four pending matters. The motion was supported by his declaration under penalty of perjury substantially in the form prescribed by the statute.[2] Judge Marie-Victoire denied the written motion on the same ground as she had rejected the oral motions.

The People promptly filed a petition in the San Francisco Superior Court for a writ of mandate or prohibition to compel Judge Marie-Victoire to disqualify herself from further proceedings in these actions.[3] The matter was assigned to Judge Claude D. Perasso. Thereupon two of the four defendants in the underlying criminal actions, Diana Solberg and Tina Peoples, appearing as real parties in interest in the writ proceeding, filed a written motion under section 170.6 to disqualify Judge Perasso. The motion was supported by a declaration of their counsel under penalty of perjury similar to that previously filed by the People against Judge Marie-Victoire (fn. 2, *ante*). Judge Perasso denied the motion on two grounds hereinafter discussed, and proceeded with the hearing.

Counsel for Judge Marie-Victoire and the municipal court offered to prove, inter alia, that the People's motions to disqualify Judge Marie-Victoire in the criminal actions were "blanket challenges" motivated by prosecutorial discontent with her prior rulings of law. Judge Perasso denied the offer as immaterial under the statute, and quashed subpoenas issued against the district attorney and his staff for the purpose of eliciting such proof. Counsel for Judge Marie-Victoire and the municipal court then declined to question the timeliness of the People's motions, and Judge Perasso determined that the motions—at least in the written form presented on October 10—complied with the requirements of section 170.6. Accordingly, Judge Perasso rendered judgment ordering that a peremptory writ issue restraining Judge Marie-Victoire from taking any further proceedings in the four actions in question other than to disqualify herself and set the matters for hearing before another judge.

---

[2] The charging portion of the declaration recited that "the Honorable Ollie Marie-Victoire, the judge before whom hearings on motions to dismiss the aforesaid actions are pending, is prejudiced against the interests of the plaintiff in the aforesaid actions, so that declarant cannot or believes that he cannot have a fair and impartial hearing before such judge."

[3] The San Francisco Municipal Court was named as an additional defendant in the writ proceeding.

Judge Marie-Victoire and the municipal court appealed from the judgment, and the appeal is now before us as People v. Municipal Court (Solberg), S.F. 23469. In addition, Diana Solberg and Tina Peoples filed a petition for writ of mandate or prohibition in the Court of Appeal to compel Judge Perasso to vacate his order denying their motion to disqualify him; that proceeding is now before us as Solberg v. Superior Court, S.F. 23449, on an alternative writ issued by the Court of Appeal. We begin with the latter proceeding.

### Solberg v. Superior Court

■ Judge Perasso rested his denial of the motion to disqualify him on two grounds. First, he reasoned that in hearing the People's petition for a writ he was acting "in an appellate capacity," and hence was exempt from disqualification under section 170.6. The point lacks merit.

While it can be said in common parlance that the writ proceeding brought by the People had the effect of "reviewing" the challenged order of Judge Marie-Victoire, the proceeding was nevertheless a matter within the original jurisdiction of the superior court. (Cal. Const., art. VI, § 10; Code Civ. Proc., §§ 1085, 1103.) It is therefore within the express terms of section 170.6, which declares that after disqualification no superior court judge shall try "any civil or criminal action or special proceeding of any kind or character" (subd. (1)). In view of this statutory language it is irrelevant that the Supreme Court and Courts of Appeal, as the Attorney General points out, have concurrent jurisdiction in such matters. The Attorney General also seeks to analogize Judge Perasso's trial of the writ proceeding to the assignment of a judge to the appellate department of the superior court.[4] But the analogy fails, as the appellate department has a limited jurisdiction over certain appeals from municipal and justice courts only. (Cal. Const., art. VI, § 11; Code Civ. Proc., § 77, subd. (g); see generally *Whittaker* v. *Superior Court* (1968) 68 Cal.2d 357, 362-365 [66 Cal.Rptr. 710, 438 P.2d 358].)

■ Judge Perasso's second and principal ground for denying the motion to disqualify him was that it was filed neither by the People as plaintiffs nor by the defendant judge or court, but by the real parties in interest; such parties, he ruled, have no standing to move under section 170.6. The ruling was erroneous. When mandamus or prohibition is sought against a court, the judge is ordinarily a neutral party with no

---

[4] A judge of the appellate department is exempted from section 170.6 by special statute. (Code Civ. Proc., § 170.7.)

interest in the outcome; the litigant designated as the real party in interest is the true adverse party. (See *Matter of De Lucca* (1905) 146 Cal. 110, 113 [79 P. 853].) He is therefore entitled to oppose the application for the writ (Code Civ. Proc., § 1107; Cal. Rules of Court, rule 56(a)(2)), and if warranted, to file a motion in the writ proceeding to disqualify the assigned judge pursuant to section 170.6.[5]

No question is raised as to either the timeliness or the formal sufficiency of the affidavit of disqualification filed by the real parties in interest; and as hereinafter appears, we have concluded that the statute is constitutional. It follows that Judge Perasso had no jurisdiction but to grant the motion and recuse himself. (Code Civ. Proc., § 170.6, subd. (3); see *McCartney* v. *Commission on Judicial Qualifications* (1974) 12 Cal.3d 512, 531-532 [116 Cal.Rptr. 260, 526 P.2d 268].) A writ of mandate will therefore lie to compel him to vacate his order denying the motion for disqualification.

All orders made thereafter by Judge Perasso in these proceedings are likewise void, including the judgment directing issuance of a peremptory writ commanding Judge Marie-Victoire to disqualify herself in the criminal matters. Nevertheless, the issues presented by the appeal from that judgment will doubtless arise on remand, and we therefore proceed to address their merits.

### *People* v. *Municipal Court (Solberg)*

██ Appellants Judge Marie-Victoire and the municipal court do not rely on the theory upon which the former denied the People's motion to disqualify her, and it is therefore deemed waived.[6] ██ Instead, appellants principally contend that section 170.6 is

---

[5]The Attorney General also seeks to uphold Judge Perasso's ruling on the ground that the pending writ proceeding assertedly involved only issues of law. Section 170.6, however, applies to any matter "which involves a contested issue *of law* or fact" (italics added; subd. (1)).

[6]The theory was untenable in any event. Judge Marie-Victoire rejected the People's motion on the ground that "once you have accepted me on these same issues, you are not entitled to disqualify me under 170.6." However, the proceedings at which the People assertedly "accepted" Judge Marie-Victoire—by failing to move for her disqualification —were not merely an earlier stage of the same prosecution (cf. § 170.6, subd. (2)), but a different group of prostitution charges brought against different defendants. Subdivision (3) of the statute bars any party from making more than one motion "in any one action or special proceeding"; by negative implication, in two successive actions a party may move to disqualify in each, or may disqualify in the later action without waiving that right by failing to so move in the earlier. The wording of the statute thus appears to foreclose any argument premised on the doctrine of collateral estoppel. (See *People* v. *Taylor* (1974) 12 Cal.3d 686, 691-698 [117 Cal.Rptr. 70, 527 P.2d 622].)

unconstitutional because it violates the doctrine of separation of powers (Cal. Const., art. III, § 3) and impairs the independence of the judiciary (*Id.,* art. VI, § 1). As amplified by amici curiae,[7] the contention is that because section 170.6 does not require the attorney or party to state the reasons for his allegation of prejudice, the statute in effect delegates to the representatives of the executive branch and to private litigants the legislative power to define the legal grounds for disqualification of trial judges; and because section 170.6 neither requires proof of such allegation of prejudice nor permits judicial review of its truth, the statute in effect delegates to the same persons the judicial power to determine whether such a ground in fact exists in the particular case in which it is invoked.

In *Johnson* v. *Superior Court* (1958) *supra,* 50 Cal.2d 693, 695-696, we rejected these identical arguments in sustaining the constitutionality of the statute. We have reviewed the decision in the light of the points raised in the present appeal, and we are convinced the opinion of Chief Justice Gibson therein, properly understood, remains sound law. For the guidance of bench and bar, however, we undertake to restate his reasoning and relate it to the concerns now urged upon us.[8]

At the outset it seems necessary to reiterate the basic principle of government underlying the decision in *Johnson*: the doctrine of the separation of powers, although enshrined in the Constitution and fundamental to the preservation of our civil liberties, "does not mean that the three departments of our government are not in many respects mutually dependent." (*Brydonjack* v. *State Bar* (1929) 208 Cal. 439, 442 [281 P. 1018, 66 A.L.R. 1507].) As this court explained more than half a century ago, "the constitutional jurisdiction and powers of the superior court [as defined in article VI of the Constitution] can in nowise

---

[7]Appellants' views are generally supported by a group of 22 trial judges appearing as amici curiae (hereinafter called "amici judges"). Their positions, however, are not identical: appellants limit their attack to the use *by the People* of the disqualification procedure provided in section 170.6, while amici judges broaden the issue to include the use of the statute by both sides in a criminal action. This distinction is debated at some length by other amici curiae, e.g., associations of prosecutors and defense counsel; but it becomes immaterial in view of the conclusion we reach herein, and we do not further address it. Finally, the State Bar, sponsor of the legislation in question, appears as amicus curiae in support of the statute and, generally, of the People.

[8]*Johnson* has been cited with approval in decisions of our sister states upholding the constitutionality of statutes essentially similar to section 170.6. (*Channel Flying, Inc.* v. *Bernhardt* (Alaska 1969) 451 P.2d 570, 575; *State* v. *District Court of Fourth Judicial Dist.* (1965) 145 Mont. 287 [400 P.2d 648, 658-660].) For a scholarly overview of law and practice on this topic, see *Disqualification of Judges for Prejudice or Bias—Common Law Evolution, Current Status, and the Oregon Experience* (1969) 48 Ore.L.Rev. 311-410.)

be trenched upon, lessened or limited by the legislature. While this is undoubtedly true it does not follow that the legislative department of the state government possesses no regulative power with relation to the jurisdiction of the superior courts of the state or to the method and procedure in and means of which the constitutional powers of these courts are to be exercised. On the contrary, it has been decided by this court in a long and consistent line of cases that 'the procedure by which the jurisdiction of said courts is to be exercised may be prescribed by the legislature, and that the statutory regulation thereof will be upheld unless such regulations should be found to substantially impair the constitutional powers of the courts or practically defeat their exercise.' " (*Sacramento etc. D. Dist.* v. *Superior Court* (1925) 196 Cal. 414, 432 [238 P. 687].) To put the matter affirmatively and more simply, the Legislature may regulate the exercise of the jurisdiction of the courts by all reasonable means.

██ Applying the foregoing principle in *Johnson,* we held that the disqualification of trial judges is an aspect of the judicial system which is subject to reasonable legislative regulation; that prejudice may properly be declared a ground of such disqualification; and that it is "wholly unnecessary"—we could have said it is virtually impossible—for the Legislature to attempt to list "the many conceivable factors which might cause a judge to be prejudiced." (50 Cal.2d at p. 696.)[9]

We then held that the method adopted by the Legislature for achieving its purpose was also reasonable. We first stressed the importance of maintaining the appearance as well as the fact of impartiality in the judicial system: the business of the courts, we observed, must be conducted in such a manner as will avoid even the "suspicion of unfairness." (*Id.,* at p. 697.) Secondly, we recognized the inherent difficulty of proving a state of mind such as prejudice, as well as the natural reluctance of courts to declare biased a judge who asserts that he is not. From these premises we reasoned that "In order to insure confidence in the judiciary and avoid the suspicion which might arise from the belief of a litigant that the judge is biased in a case where it may be difficult or impossible for the litigant to persuade a court that his belief is justified, the Legislature could reasonably conclude that a party should have an opportunity to obtain the disqualification of a judge for

---

[9]At this point we referred to the preexisting statute providing for disqualification of judges upon proof of "bias or prejudice." (Code Civ. Proc., § 170, subd. 5.) The word "prejudice" in section 170.6 is to be given the same meaning as it has in this companion statute and in the substantial body of case law construing and applying the latter.

prejudice, upon a sworn statement, without being required to establish it as a fact to the satisfaction of a judicial body." (*Ibid.*)

Much of the confusion about the rationale of *Johnson* would be cleared up if the last-quoted sentence were carefully read: we held the affidavit procedure to be reasonable in these circumstances not because it establishes prejudice "as a fact" but because it expresses "the belief of a litigant" that he cannot have a fair trial before the assigned judge. Indeed, section 170.6 explicitly recognizes such belief as a sufficient ground for disqualification: although subdivision (1) speaks generally of establishing by affidavit that the judge in question "is prejudiced," subdivision (2) explains that prejudice will be deemed "established" for this purpose if the party or his attorney swears he "cannot *or believes that he cannot* have a fair and impartial trial or hearing before such judge" (italics added).

It is thus a misreading of *Johnson* to charge that the decision is based on the "fiction" that the affidavit proves the judge is actually prejudiced, or that we there created an "irrebuttable presumption" of actual prejudice from the mere filing of such affidavit. Neither is true, for the reason that actual prejudice is not a prerequisite to invoking the statute. As we recently emphasized, "It is well recognized that in enacting Code of Civil Procedure section 170.6 the Legislature guaranteed to litigants an extraordinary right to disqualify a judge. The right is 'automatic' in the sense that a good faith *belief* in prejudice is alone sufficient, proof of facts showing actual prejudice not being required." (Italics in original.) (*McCartney* v. *Commission on Judicial Qualifications* (1974) *supra*, 12 Cal.3d 512, 531.) The affidavit is thus simply a formal means of expressing such belief; and in order to preserve public confidence in the impartiality of the courts, the belief alone will justify disqualification.[10]

[10]Although arguing in general against the validity of section 170.6, amici judges make this point with commendable candor and persuasiveness in their brief: "It is often stated that it is not only the *fact* but the *appearance* of prejudice that should disqualify a judge. This is a rule that appeals to the reason of the Constitution. . . . [I]t is not the fact of prejudice that would impair the legitimacy of the judiciary's role but rather the *probable* fact of prejudice, *i.e.*, the appearance of prejudice. The truth of few, if any, ultimate 'facts' of human existence are established to that point of complete certitude which eliminates all plausible doubt. A fact as difficult of ascertainment as any person's 'prejudice' is seldom, if ever, proven so completely that reasonable persons might not still disagree. And the mere allegation or good faith belief that a fact is true may be sufficient to cause reasonable doubt. Since the legitimacy of the Court's role is essentially a perception of the people, in whose secure confidence the courts must remain if their powers are to be maintained, it follows that merely probable or even alleged facts or a good faith belief in such facts may be sufficient to disqualify a judge."

It is earnestly contended, however, that *Johnson* is distinguishable because it addressed only the facial validity of section 170.6, and that the experience of the courts with the actual operation of the statute during the past two decades reveals such widespread and persistent abuses thereof as to warrant reconsideration of the question and a holding that section 170.6 is now unconstitutional as applied. The abuses which are said to have occurred may be divided into two principal categories.

First, section 170.6 has assertedly been invoked for the purpose of "judge-shopping," i.e., of removing the assigned judge from the case on grounds other than a belief that he is personally prejudiced within the meaning of the statute. It is conceded that a litigant is not entitled to insist on a judge of his choice. But it is argued that removal of a judge on unauthorized grounds artificially reduces the pool of qualified judges available to hear the case, injects an element of lawlessness into the judicial process, and operates in each case to abridge the neutrality of the judiciary.

Among the unauthorized grounds most commonly invoked, it is charged, is the disqualification of a judge because of his views on the law or on the exercise of judicial discretion.[11] Such a disqualification assertedly has the chilling effect of discouraging judicial creativity in fashioning new rules of law, and violates the spirit of the settled principle that prior legal rulings do not constitute actual bias warranting removal of a judge for cause. (*Calhoun* v. *Superior Court* (1958) 51 Cal.2d 257, 260-261 [331 P.2d 648]; *Kreling* v. *Superior Court* (1944) 25 Cal.2d 305, 310-312 [153 P.2d 734], and cases cited.)

Disqualification motions are also filed, it is alleged, when the party or his counsel believes the assigned judge is not professionally, emotionally, or physically competent to preside over the particular case, or has exhibited undesirable personality traits such as injudiciousness or

---

[11]Appellants contend that the case at bar is an example of this abuse. On October 2 and 8, 1975, Judge Marie-Victoire dismissed a number of prostitution cases after ruling that the defendants therein were the victims of discriminatory law enforcement practices based on the suspect classification of sex because in each instance only the female prostitute, and not her male customer, was arrested and prosecuted. As noted above, on October 9 prostitution charges against the individual real parties in interest herein came before Judge Marie-Victoire for the purpose of setting a date to hear their motions to dismiss on the same ground. The People moved to disqualify her under section 170.6 allegedly because of a perceived inability to have a fair trial "in cases of these kinds in this court" (fn. 1, *ante*). Appellants assert that the circumstances and wording of the motion show it was primarily based on the People's dissatisfaction with Judge Marie-Victoire's prior legal ruling on discriminatory law enforcement.

irascibility to a degree which threatens to impair the conduct of the proceedings. Not only are these considerations improper under the statute, but it is claimed that such a decision tends too easily to turn on the litigant's opinion as to whether the judge's prior rulings were wise or correct; and in serious cases, disqualification on any of these grounds assertedly impinges on the constitutional powers of the Commission on Judicial Performance to censure, remove, or retire a judge in appropriate circumstances. (Cal. Const., art. VI, § 18.)

Second, section 170.6 is said to have been invoked for a variety of purely tactical advantages. In a single-judge court a litigant who files a motion to disqualify automatically obtains a significant delay while an outside judge is brought into the case. Some delay inevitably ensues even in multi-judge courts; and in multi-branch courts, a disqualification may also result in a desired change in the place as well as the date of trial. In addition, in courts with specialized departments—such as a psychiatric or juvenile department—the statute has been used to remove the judge regularly sitting in that department in the hope of benefiting from the substitution of a less experienced judge. Finally, it is charged the statute has been invoked to intimidate judges generally and in certain cases even to influence the outcome of judicial election campaigns (see, e.g., *Maine v. Superior Court* (1968) 68 Cal.2d 375, 386-387 [66 Cal.Rptr. 724, 438 P.2d 372]).

We need not lengthen this recital by recounting further examples of asserted abuse of section 170.6; they are doubtless known to the bench and bar. For present purposes we assume the charges are true. We do not condone such practices, nor do we underestimate their effect on the operation of our trial courts. ▓▓▓ Nevertheless for a number of reasons we are not persuaded that we should reconsider *Johnson* on this ground and hold the statute invalid as applied.[12]

To begin with, it is inaccurate to assert that we did not know of these abuses when we decided *Johnson.* It is true that section 170.6 had then been in effect for somewhat less than a year. (See fn. 20, *post.*) But the statutes of our sister states upon which it was modelled had been operational for many years, and we were well aware of the experience thereunder. (See cases collected at pp. 697-698 of 50 Cal.2d.) For

---

[12]It follows that we shall deny a motion filed by amici judges to appoint a referee for the purpose of taking evidence of the abuses of section 170.6 set forth hereinabove. We do not reach the question of the propriety of such a motion (see Code Civ. Proc., § 909; Cal. Rules of Court, rule 23(b)), but hold rather that the evidence is not material to the disposition of this appeal.

example, one of the decisions on which we relied was the leading case of *U'Ren* v. *Bagley* (1926) 118 Ore. 77 [245 P. 1074, 46 A.L.R. 1173], which upheld the constitutionality of a disqualification statute essentially identical to section 170.6 (*id.,* at pp. 1074-1075). More than three decades before *Johnson* the Oregon court acknowledged it was "not unmindful that this law has been shamefully abused," and listed as examples the removal of judges because of their views on the law, disruptions of judicial assignments, and delays in bringing cases to trial. (*Id.,* at p. 1077.) Nevertheless the court discounted the legal effect of such practices, reasoning that "these are matters which may be more appropriately addressed to the Legislature. We are not justified in declaring a statute unconstitutional merely because of its abuse." (*Ibid.*)

We closely echoed these words in *Johnson,* declaring that "The possibility that the section may be abused by parties seeking to delay trial or to obtain a favorable judge was a matter to be balanced by the Legislature against the desirability of the objective of the statute. . . . [A]nd the fact that some persons may abuse the section is not a ground for holding the provision to be unconstitutional." (50 Cal.2d at p. 697.) It is a further misreading of *Johnson* to take this passage to refer only to hypothetical abuses potentially occurring in the future. Although we did not pause to catalog the various misuses of the statute, the practices now complained of were clearly within the contemplation of the court. The experience of the ensuing years has added quantitatively but not qualitatively to our understanding of the problem. In these circumstances *Johnson* cannot fairly be distinguished on the ground that it sustained only the facial validity of section 170.6.

Secondly, a case can be made for the proposition that some of the abuses condemned by amici judges are self-limiting. For example, a lawyer who practices in a single-judge court must realize that an improper use of section 170.6 in one or more cases risks antagonizing the very judge before whom he must inevitably appear in all the other cases he has and will have in that court. It is true that an individual litigant may not share his concern, but the lawyer's self-interest should give him ample incentive to dissuade his client from demanding an unjustified disqualification. In a multi-judge court this risk is attenuated but not negligible; and in both settings it is compounded by the real possibility that the substitute judge who enters the case may be even less satisfactory to the lawyer or his client than the judge whom they disqualify. In that event there is no escape from the dilemma—short of undertaking the often difficult task of attempting to prove actual bias under section

170—because subdivision (3) of section 170.6 declares that "under no circumstances" can a party or his attorney make more than one motion pursuant thereto in each case.

The latter provision, of course, is one of the several statutory safeguards which we characterized in *Johnson* as "designed to minimize such abuses." (50 Cal.2d at p. 697.) The others are (*ibid.*) that the section "requires that the party or his attorney show good faith by declaring under oath that the judge is prejudiced, and provides for timely making of the challenge before trial, for strictly limited granting of continuances, and for reassignment as promptly as possible."

We do not share amici judges' pessimistic view of the effectiveness of these safeguards. As to the affidavit requirement, we recognize that some minimal degree of false swearing may be unavoidable in any contemporary judicial system. But this does not mean the requirement is a hollow formality, or that substantial numbers of members of the bar are so neglectful of their personal and professional honor that they repeatedly perjure themselves merely to gain an uncertain advantage in litigation. We therefore reaffirm the belief we expressed in *Johnson* that "We cannot properly assume that there will be a wholesale making of false statements under oath" (50 Cal.2d at p. 697).

Next we emphasize the important fact that in the years since *Johnson* the courts of this state have been vigilant to enforce the statutory restrictions on the number and timing of motions permitted. Thus decisions of the Courts of Appeal too numerous to cite have insisted on strict compliance with the requirement (subd. (2)) that if the assigned judge is known ten days before trial the motion must be made "at least five days before that date." (See, e.g., *Hospital Council of Northern Cal. v. Superior Court* (1973) 30 Cal.App.3d 331, 338-340 [106 Cal.Rptr. 247].) The limitation of the statute to "one motion for each side" (subd. (3)), as amici judges concede, "reduces the quality and quantity of the injury caused by the section." We enunciated a test for invoking this restriction in *Johnson* (50 Cal.2d at p. 700), and applied it in a criminal context in *Pappa* v. *Superior Court* (1960) 54 Cal.2d 350, 353-356 [5 Cal.Rptr. 703, 353 P.2d 311]. In the same case we construed the limitation of one motion "in any one action" (subd. (3)) to bar a second motion made on retrial. (*Id.,* at p. 353.) And we construed the requirement that the motion be filed before "trial of the cause has . . . commenced" (subd. (2)) to prohibit making a motion for the first time in post-trial matters which are essentially a "continuation" of the main proceeding, such as hearings

on orders to modify (*Jacobs* v. *Superior Court* (1959) 53 Cal.2d 187 [1 Cal.Rptr. 9, 347 P.2d 9]) or enforce (*McClenny* v. *Superior Court* (1964) 60 Cal.2d 677 [36 Cal.Rptr. 459, 388 P.2d 691]) the original judgment. In the latter case we warned that "We cannot ignore in defendant's position the potentiality for abuse of section 170.6. ■ ■■■We cannot permit a device intended for spare and protective use to be converted into a weapon of offense and thereby to become an obstruction to efficient judicial administration." (*Id.,* at p. 689.)[13]

Appellants and amici judges propose three additional constructions of section 170.6 to deal with the problem of abuse. As will appear, however, each would rewrite the statute in the guise of construing it, would introduce procedural complications resulting in delay, and would contravene the fundamental policies articulated in *Johnson.*

Thus appellants urge that section 170.6 be construed to create a "rebuttable presumption" shifting the burden of proof to the challenged judge: under this view, if a motion to disqualify is filed the judge must recuse himself unless *he* can prove "to a reasonable degree of certainty" that the motion is actually based on a disagreement with his prior rulings or on other improper considerations. But the proposal would require us to read out of the statute the express provision (subd. (3)) that when a motion is duly presented and an affidavit filed, "thereupon and without any further act or proof" another judge must be assigned to the case. ■ When statutory language is thus clear and unambiguous there is no need for construction, and courts should not indulge in it. (*Caminetti* v. *Pac. Mutual L. Ins. Co.* (1943) 22 Cal.2d 344, 353-354 [139 P.2d 908], and cases cited.) In any event the proposal would be wholly impractical in operation, as it would require the judge to prove facts on a subject which is not within his knowledge but within the knowledge of the moving party, i.e., the latter's motives for seeking to disqualify him.

Amici judges propose two alternative constructions of the statute. First, they urge that we adopt the federal practice on judicial disqualifi-

[13]Amici judges evidently err when they claim the Legislature "gutted" the continuation doctrine by a 1965 amendment to section 170.6. That amendment added the last sentence of subdivision (2), which provides only that the fact that a judge has presided at a *pretrial* hearing not involving a determination of contested fact issues relating to the merits does not bar a later motion otherwise timely. The rule of *Jacobs* and its progeny is unaffected by this legislation.

cation.[14] Under federal law, a trial judge must disqualify himself when a party files an affidavit alleging he has a personal bias or prejudice against the affiant. (28 U.S.C. § 144.) In addition, however, the statute expressly decrees that "The affidavit shall state the facts and the reasons for the belief that bias or prejudice exists," and the cases require this statement to be detailed and specific as to time, place, persons, and circumstances. The statute has consistently been interpreted to mean that although the judge must assume the truth of the facts asserted, he nevertheless has the right to determine whether they are legally sufficient to constitute the kind or degree of bias warranting his disqualification; if he finds them insufficient, he may decline to recuse himself. (*Berger* v. *United States* (1921) 255 U.S. 22 [65 L.Ed. 481, 41 S.Ct. 230]; see generally Wright et al., 13 Federal Practice and Procedure (1975) § 3551, pp. 373-382.)[15]

Again the suggestion would require us to rewrite section 170.6, this time by reading into subdivision (2) thereof a requirement that the affidavit state the specific facts and circumstances which gave rise to the affiant's belief of prejudice. Such a construction would also be inconsistent with subdivision (5), which directs that all affidavits filed under the statute be "substantially" in the form which it then sets forth.[16] The form makes no provision for a detailed statement of facts, and it is reasonable to infer the Legislature did not intend to impose such a condition.

Moreover, the proposal would compel the litigant to spread the details of his charges of judicial prejudice on the public record. (See, e.g., *Berger* v. *United States* (1921) *supra,* 255 U.S. 22, 28-29 [65 L.Ed. 481, 483-484].) We see no net benefit to be gained by this additional step. Because the judge would not be permitted to rule on the truth or falsity of such allegations, they would stand unchallenged no matter how divorced from reality they might be. Not only could this present to the public a distorted picture of judicial impartiality, but the judge would be compelled to accept the charges as true even though he may have

[14]A similar suggestion was made by a concurring and dissenting justice in *Fraijo* v. *Superior Court* (1973) 34 Cal.App.3d 222, 228-231 [109 Cal.Rptr. 909], but the majority therein impliedly declined to adopt it (see *id.,* at p. 226).

[15]The federal practice has not gone without criticism. (See, e.g., Note, *Disqualification of a Federal District Judge for Bias—The Standard Under Section 144* (1973) 57 Minn.L.Rev. 749, 754 et seq.; Note, *Disqualification of Judges for Bias in the Federal Courts* (1966) 79 Harv.L.Rev. 1435, 1439 et seq.)

[16]For an example of the use of the form in this case, see footnote 2, *ante.*

personal knowledge they are false.[17] And even the limited judicial review contemplated by this suggestion could produce sharp disputes in open court over whether particular judicial behavior is or is not sufficient to demonstrate bias. We can only believe the consequences would be a diminution in public respect for the judicial system, needless friction between judges and the attorneys who appear before them, and further delays in bringing cases to trial.

Each of these defects is also present in the alternative proposal of amici judges, which is to adopt the Oregon practice on judicial disqualification.[18] The Oregon statute requires a judge to recuse himself upon the filing of an affidavit of prejudice; the affidavit need not include a statement of the facts giving rise to the belief in bias, but it must include a statement by the affiant that the motion is "made in good faith and not for the purposes of delay." (Ore. Rev. Stat. § 14.260.) In *State* v. *Weiss* (1967) 250 Ore. 252 [430 P.2d 357], the Oregon Supreme Court construed the latter requirement to permit the judge to question whether the motion was in fact made in good faith. The burden then shifted to the affiant to "come forward with some evidence, hearsay or otherwise, from which a reasonable person could conclude that anyone possessed of such evidence might reasonably question the trial judge's impartiality in a matter." (*Id.,* at p. 360.)

To adopt this interpretation would compel a somewhat different judicial revision of section 170.6. Although our statute does not call for a specific allegation of the affiant's good faith, we have repeatedly held that the motion nevertheless "requires a *good faith* belief in the judge's prejudice on the part of the individual party or counsel . . . ." (Italics in original.) (*McCartney* v. *Commission on Judicial Qualifications* (1974) *supra,* 12 Cal.3d 512, 538, fn. 13.) To so hold does not add anything to the statute, because the requirement is already implicit in the necessity for making the motion under oath: "the objective of a verification is to insure good faith in the averments of a party" (*ibid.*). Conversely, for purposes of this statute good faith is sufficiently established by the act of verification itself: as noted hereinabove, we explained in *Johnson* that section 170.6 "requires that the party or his attorney *show good faith by declaring under oath* that the judge is prejudiced" (italics added; 50 Cal.2d at p. 697). To oblige the affiant to

---

[17]The federal courts have so stated. (See, e.g., *Hodgson* v. *Liquor Salesmen's U. Loc. No. 2 of State of N. Y.* (2d Cir. 1971) 444 F.2d 1344, 1348.)

[18]We are aware of no other jurisdiction which has adopted the Oregon practice in the 10 years since Oregon devised it.

go behind his oath and prove his good faith as a matter of fact would therefore constitute a substantial departure from the statutory scheme.

Furthermore, it appears to us that in practice the showing of good faith required under the Oregon system would not be significantly different from the specific allegations of prejudice necessary under the federal procedure: an affiant desiring to show he acted on evidence from which a person "might reasonably question the trial judge's impartiality" (*State* v. *Weiss, supra,* at p. 360 of 430 P.2d) would naturally be led to "state the facts and the reasons for [his] belief that bias or prejudice exists" (28 U.S.C. § 144). (See, e.g., *State* ex rel. *Strain* v. *Foster* (1975) 272 Ore. 464 [537 P.2d 547, 549-551].) To the extent this is so, of course, the Oregon system shares the above-discussed defects of the federal procedure.[19]

It is next contended that *Johnson* is distinguishable because it ruled on the constitutionality of section 170.6 only in a civil setting,[20] and that in a criminal context the statute should be declared invalid primarily because of an asserted difference in the nature of the parties and their counsel. The argument is that in all criminal actions the plaintiff and its attorney remain the same, i.e., the People of the State of California represented by the district attorney; the defendant is different in each case, but in most instances is represented by the same counsel, the public defender.[21]

---

[19]In addition, the Oregon practice seems particularly likely to result in substantial delays. The court in *Weiss* fashioned the following procedure for litigating the issue of "good faith": the judge first denies the motion of disqualification; the moving party then applies to a higher court for an alternative writ of mandate; in his return to the alternative writ the judge challenges the moving party's good faith in making the motion; the matter is referred to a disinterested judge for proceedings in the nature of a referee's hearing; at the conclusion of the hearing the latter files a transcript and his findings and recommendations; and on this record the court before which the writ proceeding is pending then determines the ultimate issue of good faith. (430 P.2d at p. 359.)

Some idea of the delays entailed in this procedure can be gleaned from the history of the *Weiss* case itself. The opinion does not disclose the date on which the motion to disqualify was filed, but on July 19, 1967, the issue of good faith was ordered submitted to a referee. The latter held a hearing and filed his report with the Oregon Supreme Court. The defendant judge apparently moved on December 21, 1967, to set aside the referee's report. It was not until June 14, 1968, however, that the court issued the peremptory writ directing the judge to disqualify himself. The trial was held in abeyance throughout this period of almost a year. (See *State* v. *Weiss* (1968) 250 Ore. 252 [442 P.2d 241, 242].)

[20]The underlying action in *Johnson* was for malpractice. As originally enacted in 1957, section 170.6 was limited to civil cases (Stats. 1957, ch. 1055, p. 2288); in 1959 it was amended to apply to criminal actions as well (Stats. 1959, ch. 640, p. 2620).

[21]This appears somewhat of an overstatement, as a significant proportion of criminal defendants are represented by private counsel either appointed by the court or privately

This uniformity of either party or counsel assertedly permits the "institutionalization" of many of the abuses discussed herein, and in particular the abuse known as the "blanket challenge." The practice occurs when as a matter of office policy a district attorney or a public defender instructs his deputies to disqualify a certain disfavored judge in all criminal cases of a particular nature—such as those involving prostitution or illegal narcotics—or in all criminal cases to which he is assigned. The former policy will prevent the judge from hearing any cases of that type, while the latter policy will force his removal from the criminal bench and his reassignment to a civil department.[22]

Upon close analysis we conclude this contention is different not in kind but only in degree from the arguments rejected in *Johnson,* and that the difference does not warrant a contrary result. To begin with, we do not believe the self-limiting aspects of abuse of section 170.6 discussed hereinabove are inoperative in the criminal context. A district attorney or a public defender must realize that his practice tends to be concentrated in a particular court, and that if he or his deputies file unwarranted "blanket challenges" against a particular judge the effect may well be to antagonize the remaining judges of the court, one of whom will be assigned to replace their unseated colleague, and the presiding judge, who will make that assignment. Moreover, the delay attendant on such a substitution should not commend itself to the prosecutor whose duty and self-interest urge prompt disposition of pending cases, or to any defense counsel whose client has not been released on bail and for that or other reasons benefits from speedy trial requirements.

More importantly, the issue of "blanket challenges" is not new to this court. In *McCartney* v. *Commission on Judicial Qualifications* (1974) *supra,* 12 Cal.3d 512, we reviewed a recommendation that a judge be

---

retained. For example, in the case at bar defendants Solberg and Peoples are represented by private counsel.

[22]Even when this radical consequence ensues the case is distinguishable from *People* v. *Tenorio* (1970) 3 Cal.3d 89 [89 Cal.Rptr. 249, 473 P.2d 993], and its progeny (*Esteybar* v. *Municipal Court* (1971) 5 Cal.3d 119 [95 Cal.Rptr. 524, 485 P.2d 1140]; *People* v. *Navarro* (1972) 7 Cal.3d 248 [102 Cal.Rptr. 137, 497 P.2d 481]; *People* v. *Superior Court (On Tai Ho)* (1974) 11 Cal.3d 59 [113 Cal.Rptr. 21, 520 P.2d 405]). In each of the cited decisions we held violative of the separation of powers a statute which subjected to prosecutorial veto the power of the *court* to perform a judicial act, such as striking a prior conviction or committing the defendant to a special rehabilitative program. The effect of the statute here challenged is at most to remove the individual *judge* assigned to the case or the department, but not to deprive the *court* of the power to hear such cases by assignment of another judge.

permanently removed from office because of various acts of misconduct. One of those acts was to engage in angry and excited dialogues with deputy public defenders who filed affidavits of prejudice against him under section 170.6. (*Id.,* at p. 529.) Among the judge's proffered defenses was a claim that the affidavits were filed pursuant to a policy of the public defender's office to prevent him from presiding over criminal trials. (*Id.,* at p. 537.) We acknowledged (at pp. 537-538) that "the entire policy itself may have been an affront to the court's dignity if it stemmed from public defenders' dissatisfaction with [Judge McCartney's] 'hard line' performance as a district attorney rather than a good faith belief in prejudice." (Italics deleted.)

In a footnote at this point (fn. 13) we recited that within a few months after Judge McCartney began his term of office the public defender directed his deputies in writing to file affidavits of prejudice in all criminal proceedings assigned to the judge thereafter. We were unable to determine the exact reason for this policy from the record, finding equally strong the inferences that the deputy public defenders were either seeking to remove Judge McCartney from the criminal bench or were legitimately concerned that he would be partial to the prosecution or would take an inordinate time to try their cases. We felt compelled, nevertheless, to speak to the "blanket" nature of these filings. We explained that under section 170.6 the affiant must hold the required good faith belief in prejudice "in *each* particular case" in which he invokes the statute, and we concluded that "The 'blanket' nature of the written directive issued by the public defender arguably contravened this requirement of *good faith* by withdrawing from each deputy the individual decision whether or not to appear before [Judge McCartney]. To phrase it another way, the office policy predetermined that prejudice would be claimed by each deputy without regard to the facts in each case handled by the office, thereby transforming the representations in each affidavit into bad faith claims of prejudice." (*Ibid.*)

There is thus no doubt that in *McCartney* we strongly disapproved of the practice of "blanket challenges," and we reaffirm that position herein. But it is also manifest from *McCartney* that we do not believe the practice vitiates the statute: despite our disapproval we concluded (at p. 538), "even assuming arguendo that the evidence was clear and convincing," i.e., that the motions were "blanket challenges" made on unauthorized grounds, the practice could not justify Judge McCartney's injudicious response because "the Legislature clearly foresaw that the

peremptory challenge procedure[23] would be open to such abuses but intended that the affidavits be honored notwithstanding misuse. (See *Johnson* v. *Superior Court* (1958) 50 Cal.2d 693, 697 . . . .)" In short, the possibility of the filing of "blanket challenges" does not distinguish the present criminal proceeding from *Johnson,* and the reasoning of that decision is equally applicable to the current version of the statute, governing both civil and criminal cases. (Accord, *Journey* v. *Superior Court* (1975) 47 Cal.App.3d 408, 411 [120 Cal.Rptr. 897].)

▮ We conclude that to the extent that abuses persist in the utilization of section 170.6 they do not, in our judgment, "substantially impair" or "practically defeat" the exercise of the constitutional jurisdiction of the trial courts. Rather, it may be helpful to view them as a relatively inconsequential price to be paid for the efficient and discreet procedure provided in section 170.6. The statute thus remains a reasonable—and hence valid—accommodation of the competing interests of bench, bar, and public on the subject of judicial disqualification. We do not doubt that should future adjustments to this sensitive balance become necessary or desirable, the Legislature will act with due regard for the rights of all concerned.

The motion to appoint a referee and take evidence is denied. In S.F. 23449, let a peremptory writ of mandate issue as prayed. In S.F. 23469, the appeal is dismissed. All parties shall bear their own costs.

Clark, J., Richardson, J., Sullivan, J.,* and Wright, J.,† concurred.

**TOBRINER, Acting C. J.,** Concurring and Dissenting.—Although I concur in the majority's conclusion that Judge Perasso was properly disqualified in this case and thus agree with the majority's disposition of these matters, I cannot join in the majority's further conclusion that

---

[23]Our characterization of section 170.6 as "the peremptory challenge procedure" was not a sub silentio overruling of *Austin* v. *Lambert* (1938) 11 Cal.2d 73 [77 P.2d 849, 115 A.L.R. 849], the decision which struck down the predecessor to the current statute, but merely a convenient, abbreviated—though imprecise—way of distinguishing section 170.6 from section 170, the procedure for disqualifying judges for cause. We recognize that similar usage is not uncommon among the bench and bar (see, e.g., fn. 1, *ante*), and we attribute no sinister significance to it.

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairman of the Judicial Council.

†Retired Chief Justice of California sitting under assignment by the Acting Chairman of the Judicial Council.

Judge Marie-Victoire erred in rejecting the section 170.6 disqualification motion filed by the deputy district attorney in the municipal court.

In my view, the use of "blanket" challenges under section 170.6 to disqualify a judge because of his judicial philosophy or his prior rulings on questions of law seriously undermines the principle of judicial independence and distorts the appearance, if not the reality, of judicial impartiality. Unlike the majority, I do not believe that the judiciary is helpless to prevent such an abuse of the section 170.6 disqualification procedure, particularly in a case—such as the present one—in which the improper basis of the disqualification motion clearly appears on the face of the record. In my view, both the language and the purpose of section 170.6 support the trial court's refusal to recuse herself in the instant case.

Section 170.6, subdivision (1), provides in relevant part: "No judge . . . shall try any civil or criminal action . . . nor hear any matter . . . when it shall be established as hereinafter provided that such judge or court commissioner *is prejudiced* against any party or attorney or the interest of any party or attorney appearing in such action or proceeding." (Italics added.) Section 170.6 subdivision (2) goes on to provide that the affidavit which a party or attorney must file to bring about the disqualification of a judge under section 170.6 should affirmatively state that the judge "*is prejudiced* against any such party or attorney . . . so that such party or attorney cannot or believes that he cannot have a fair and impartial trial or hearing before such judge." (Italics added.)

Thus, the statutory language posits the *judge's prejudice,* or a party's or attorney's belief *in the judge's prejudice,* as the essential basis for a section 170.6 disqualification motion. That a party or attorney believes that a judge is likely to rule against his interests does not invoke the section; rather, the party or attorney must have a "good faith belief in the [judge's] *prejudice.*" (Italics added.) (*McCartney* v. *Commission on Judicial Qualifications* (1974) 12 Cal.3d 512, 531 [116 Cal.Rptr. 260, 526 P.2d 268].)

Past California cases establish beyond doubt that a judge's judicial philosophy or prior rulings of law do not afford a proper basis for a claim of prejudice. " 'The words "bias" and "prejudice" . . . refer to the mental attitude or disposition of the judge towards a party to the litigation, and not to any views that he may entertain regarding the subject matter involved.' " (*Evans* v. *Superior Court* (1930) 107 Cal.App. 372, 380 [290 P. 662].) As this court emphasized more than a half century ago: "[R]ulings

against a litigant, even when numerous and continuous, form no ground for a charge of bias or prejudice." (*McEwen* v. *Occidental Life Insurance Co.* (1916) 172 Cal. 6, 11 [155 P. 86].)

The record in the instant case demonstrates that the disqualification motion at issue rested directly upon "the views that [the trial judge] entertain[ed] regarding the subject matter involved," rather than any claim of personal enmity or ill will. Shortly before the present matter came before Judge Marie-Victoire, Judge Marie-Victoire had sustained, in separate criminal proceedings, a constitutional challenge to the procedures used to enforce the prostitution solicitation laws in San Francisco. When the instant charges—also pertaining to solicitation of an act of prostitution—came before Judge Marie-Victoire, the deputy district attorney stated in open court that his disqualification motion was premised on the fact that "the People don't feel that we can get a fair trial *in cases of these kinds* in this court." (Italics added.) This comment demonstrates that the disqualification motion emanated from the People's disagreement with the merits of Judge Marie-Victoire's views on the legal issue relating to the discriminatory enforcement of prostitution laws; the statement additionally establishes that the district attorney's office had adopted a "blanket" policy of using section 170.6 to attempt to disqualify Judge Marie-Victoire in all such prostitution cases. Under these circumstances, I believe Judge Marie-Victoire properly concluded that the motion did not generate from a good faith belief in her "prejudice"; she correctly determined that section 170.6 did not compel her disqualification.

Although the majority do not suggest that a party's disagreement with a judge's rulings of law constitute a basis for a claim of prejudice, conceding the inappropriateness of the practice of "blanket challenges" under section 170.6 (see p. 203, *ante*), the majority apparently despair of any attempt to confine section 170.6 to its proper application without undermining the principal purpose of the section. The majority reason that judicial inquiry into whether or not allegations of prejudice have been made in good faith would violate the language of section 170.6 subdivision (3), which provides that when a disqualification motion is "duly presented" and an affidavit timely filed, "thereupon and without any further act or proof" another judge must be assigned to the case. A disqualification motion, however, is not "duly presented" within the meaning of the statute when it appears on the face of the record that the motion does not rest on a belief in prejudice, but merely on a disagreement with the judge's prior legal rulings.

Ordinarily, of course, litigants need not state the grounds for their belief that the challenged judge is prejudiced. When a "blanket challenge" policy has been adopted, however, the requirement of a "good faith belief in prejudice" obviously has been violated. We intimated as much in our recent *McCartney* case, declaring that such a "blanket challenge" policy "predetermined that prejudice would be claimed by each deputy without regard to the facts in each case handled by the office, thereby transforming the representations in each affidavit into *bad faith* claims of prejudice." (Italics added.) (12 Cal.3d at p. 538.)[1] In the instant case, of course, the deputy district attorney explicitly confirmed the existence of the "blanket challenge" policy in his statement in open court.

The instant ruling allows a litigant to remove a judge from the bench despite the patently false nature of the claim of prejudice offered. No matter how transparent the deception, the majority instruct the trial judge to step aside. I cannot concur in the majority's conclusion that the judiciary is powerless to prevent such an abusive exercise of the disqualification procedure.

The petition of the defendants and appellants for a rehearing was denied April 21, 1977. Tobriner, J., was of the opinion that the petition should be granted.

---

[1]The majority imply that the legality of "blanket" challenges under section 170.6 was upheld in *McCartney*. As I read the *McCartney* decision, however, we did *not* hold that when a trial judge is challenged in accordance with an adopted policy of "blanket" disqualification that he must always honor the challenge and withdraw. Nor did we hold that blanket challenge practices are beyond the bounds of judicial inquiry. We merely stated that a practice of blanket challenges "is simply no answer to petitioner's serious departures from a proper judicial role or his habitual intemperance toward defendants and court personnel." (12 Cal.3d at p. 537.)