[No. C003773. Third Dist. Sept. 20, 1991.]

THE PEOPLE, Plaintiff and Appellant, v.
STANLEY BURROUGHS, Defendant and Respondent.

**COUNSEL**

John K. Van de Kamp and Daniel E. Lungren, Attorneys General, Steve White, Chief Assistant Attorney General, W. Scott Thorpe and Shirley A. Nelson, Deputy Attorneys General, for Plaintiff and Appellant.

Mitchell, Higgins, Wolfe, Peasley & Barney and Jack Mitchell for Defendant and Respondent.

**OPINION**

**PUGLIA, P. J.**—Business and Professions Code sections 2052 and 2053 (hereafter sections 2052 and 2053) proscribe the unlicensed practice of

medicine. Under section 2052 it is a misdemeanor for one without a license to practice, attempt to practice, advertise or hold himself or herself out as practicing medicine, or to diagnose, treat, or prescibe for any physical condition of any person. Section 2053 elevates this same conduct to a felony when done "willfully, under circumstances or conditions which cause or create risk of great bodily harm, severe physical or mental illness, or death . . . ."[1] In this appeal by the People we shall conclude section 2053 is not violated unless the intended victim is actually threatened with such harm.

Defendant was not licensed to practice medicine. An undercover investigator sought treatment from defendant, representing that he was afflicted with physical ailments from which he was not actually suffering. He received diagnosis and treatment from defendant which, had he been so afflicted, would have created a risk of great bodily harm, serious physical illness or death. The trial court granted defendant's motion (Pen. Code, § 995) to set aside count I of the information charging violation of section 2053 because the investigator was not actually threatened with such harm. We shall affirm.

## I

Testimony at the preliminary examination disclosed that Inspector Ronald Olson of the California Board of Medical Quality Assurance initiated an undercover investigation of defendant. Defendant was not licensed to practice medicine in California. Olson contacted defendant by telephone and informed him that he was suffering from headaches, high blood pressure and an ulcer, and had heard defendant might be able to help. Defendant responded that he could do so. Olson informed defendant he was taking the

---

[1] Section 2052 provides: "Any person who practices or attempts to practice, or who advertises or holds himself or herself out as practicing, any system or mode of treating the sick or afflicted in this state, or who diagnoses, treats, operates for, or prescribes for any ailment, blemish, deformity, disease, disfigurement, disorder, injury, or other physical or mental condition of any person, without having at the time of so doing a valid, unrevoked, or unsuspended certificate as provided in this chapter, or without being authorized to perform such act pursuant to a certificate obtained in accordance with some other provision of law, is guilty of a misdemeanor."

Section 2053 provides: "Any person who willfully, under circumstances or conditions which cause or create risk of great bodily harm, serious physical or mental illness, or death, practices or attempts to practice, or advertises or holds himself or herself out as practicing, any system or mode of treating the sick or afflicted in this state, or diagnoses, treats, operates for, or prescribes for any ailment, blemish, deformity, disease, disfigurement, disorder, injury, or other physical or mental condition of any person, without having at the time of so doing a valid, unrevoked and unsuspended certificate as provided in this chapter, or without being authorized to perform that act pursuant to a certificate obtained in accordance with some other provision of law, is punishable by imprisonment in the county jail for not exceeding one year or in the state prison. [¶] The remedy provided in this section shall not preclude any other remedy provided by law."

prescription drug Minipress for high blood pressure and the controlled substance Damason-p for headaches. Defendant indicated "he could treat that with his therapy" which he described as involving a lemonade mixture and "Vita Flex" massages. Defendant instructed Olson not to take the Damason-p the next time he had a headache but instead to visit defendant. Olson was not actually suffering from any of the ailments mentioned, nor was he taking the medication indicated.

The following morning, Olson telephoned defendant's home and obtained an appointment to see him that day. When Olson arrived for the appointment he told defendant he had a headache and had come for treatment. He again informed defendant he had an ulcer and high blood pressure for which he was taking Minipress. Defendant responded, " 'Well, let's see if we can get rid of the headache first.' "

Defendant proceeded to massage Olson's right hand and pull on the outside of Olson's elbow. This was repeated on the left side and continued until Olson indicated the headache was gone. While conducting this treatment, defendant explained to Olson the Vita Flex treatment. Defendant stated the body is like a computer with control points throughout which he, defendant, is able to push, thus allowing the body to correct itself. Olson was not asked about his medical history and no measurements were taken of his blood pressure. At one point defendant showed Olson a book he had authored entitled "Healing for the Age of Enlightenment" and indicated the book explained further the Vita Flex therapy, lemonade diet, and color therapy which defendant also used.

After Olson indicated the headache was gone, defendant said he would do a complete Vita Flex therapy on Olson and asked Olson to take off his shoes. Defendant then massaged Olson's feet and later used a vibrator on Olson's feet, neck and shoulder. Defendant also used his hands to massage Olson's head.

Defendant informed Olson this treatment would correct any other ailments in Olson's body. Defendant indicated the high blood pressure and ulcer could be treated by the lemonade diet and said Olson would not have to take the Minipress. Defendant described the lemonade diet as a mixture of lemons or limes, cayenne pepper, pure maple syrup and water. Olson was instructed to drink six to ten glasses per day of this elixer, all the water he wanted, and herbal tea in the morning or night as a laxative, but not to eat any foods. This was to be continued for 10 days after which, Olsen was assured, the high blood pressure would be reduced or eliminated and the ulcer gone.

As Olson prepared to leave, defendant indicated he was not a doctor. Olson then asked if he should come in and have his blood pressure checked after discontinuing the Minipress. Defendant indicated this would not be necessary. Olson paid defendant $65 for one gallon of maple syrup, a copy of defendant's book, and the treatment.

Several weeks later, Olson executed a search warrant at defendant's residence and seized "hundreds, maybe thousands" of copies of defendant's book, colored plastic inserts for a lamp, an electric massager, lemons, mixers, and six or eight cases of maple syrup. Defendant was placed under arrest.

According to expert medical testimony Minipress is a medication for the treatment of high blood pressure and a person with high blood pressure who stops taking the medication risks heart attack, stroke, and other serious medical conditions. Furthermore, pepper and citric acid from lemonade might aggravate an ulcer.

The magistrate found: (1) because Inspector Olson was not suffering from the conditions represented, the treatment prescribed by defendant did not create a risk to Olson of great bodily harm or illness; and (2) had Olson been suffering from the conditions represented, the treatment prescribed would have created such a risk.

Following the preliminary examination an information was filed charging defendant in separate counts with violation of sections 2052 and 2053. On defendant's motion, the trial court set aside count I of the information charging a violation of section 2053. Defendant then pled guilty to count II charging a violation of section 2052, the unlicensed practice of medicine under circumstances not threatening great bodily harm, serious physical illness or death. The People appeal from the order setting aside count I. (Pen. Code, § 1238, subd. (a)(1).)

II

On appeal the People contend section 2053 does not require actual harm or the threat of harm to a particular victim but instead is violated whenever unlicensed practice of medicine threatens harm to the public in general. According to the People, defendant's treatment of Olson, given what he understood Olson's condition to be, demonstrates defendant's unlicensed practice of medicine threatens great harm to prospective "patients."

■ In determining the proper scope of section 2053, our primary task is to determine legislative intent. For this we begin with the wording of the statute itself. (*Brown* v. *Kelly Broadcasting Co.* (1989) 48 Cal.3d 711, 724 [257 Cal.Rptr. 708, 771 P.2d 406].) Where the language of the statute is clear there is no need to resort to other indicia of legislative intent; there is no need for construction. (*Lungren* v. *Deukmejian* (1988) 45 Cal.3d 727, 735 [248 Cal.Rptr. 115, 755 P.2d 299]; *Solberg* v. *Superior Court* (1977) 19 Cal.3d 182, 198 [137 Cal.Rptr. 460, 561 P.2d 1148].)

Sections 2052 and 2053 prohibit the identical conduct by one not licensed to practice medicine. Section 2053, however, applies only where such conduct occurs "under circumstances or conditions which cause or create risk of great bodily harm, serious physical or mental illness, or death." This language of section 2053 could not be more clear. ■ It is not enough that the evidence suggests defendant is disposed to engage in the unlicensed practice of medicine without regard to whether or not circumstances creating the risk of great bodily harm exist. There must be unlawful practice of medicine actually involving such circumstances. Since, contrary to his representations to defendant, Inspector Olson was not actually suffering from the physical ailments he described to defendant, the requisite circumstances were lacking.

Alternatively, the People contend defendant violated section 2053 because he *attempted* to practice medicine without a license under the circumstances which elevate the offense to a felony by willfully prescribing treatment which would have threatened great bodily harm or illness to one suffering from the conditions which defendant believed to exist. According to the People, but for the intervening fact that Olson did not suffer from the conditions represented, the crime would have been complete. The People rely on two Supreme Court decisions, *People* v. *Camodeca* (1959) 52 Cal.2d 142 [338 P.2d 903] and *People* v. *Rojas* (1961) 55 Cal.2d 252 [10 Cal.Rptr. 465, 358 P.2d 921, 85 A.L.R.2d 252].

In *Camodeca*, the defendant was prosecuted for attempted grand theft by false pretenses. Conviction required a finding of intent to consummate a theft and " 'a direct, unequivocal act toward that end. . . .' [Citation.]" (52 Cal.2d at p. 145.) The defendant argued there was no attempt because, before commission of a direct, unequivocal act, the putative victim had gone to the authorities and therefore was no longer deceived. The court found an attempt nevertheless: "When it is established that the defendant intended to commit a specific crime and that in carrying out this intention he committed an act

that caused harm or sufficient danger of harm, it is immaterial that for some collateral reason he could not complete the intended crime. Although the law does not impose punishment for guilty intent alone, it does impose punishment when guilty intent is coupled with action that would result in a crime but for the intervention of some fact or circumstance unknown to the defendant. [Citations.]" (*Id.* at p. 147.)

In *Rojas*, the police arrested a thief and recovered stolen property which he had intended to sell to defendant. The police then permitted the thief, under their surreptitious control, to deliver the property to defendant and collect a price. The Supreme Court found defendant's conduct sufficient to establish an attempt to receive stolen property. The defendant argued the element that he receive with knowledge the property was stolen was not made out because one could not "know" the property was stolen when in fact it had been recovered from the thief and could no longer be said to be stolen. The court rejected this argument, explaining: "In the case at bench the criminality of the attempt is not destroyed by the fact that the goods, having been recovered by the commendably alert and efficient action of the Los Angeles police, had, unknown to defendants, lost their 'stolen' status . . . . In our opinion the consequences of intent and acts such as those of defendants here should be more serious than pleased amazement that because of the timeliness of the police the projected criminality was not merely detected but also wiped out." (55 Cal.2d at p. 258, citations omitted.)

*Camodeca* and *Rojas* are inapposite. Both cases involved the general attempt statute, Penal Code section 664.[2] But section 2053 contains its own prohibition against the attempted practice of medicine without a license. So also does section 2052. Thus if an unlawful attempt to practice medicine is committed under circumstances which do not cause or threaten to cause great bodily harm or illness, the offense committed is a violation of section 2052, not an attempted violation of section 2053.

Because Olson did not actually suffer from the physical ailments which he feigned to defendant, and therefore was not threatened with serious bodily harm or illness by defendant's treatment of him, the evidence does not make out a violation of section 2053 or an attempt to violate that section and the trial court properly granted the motion to set aside count I.

---

[2]Penal Code section 664 prescribes punishment for "Every person who attempts to commit any crime, but fails, or is prevented or intercepted in the perpetration thereof, . . . where no provision is made by law for the punishment of such attempts . . . ."

The judgment (order) is affirmed.

Davis, J., and Scotland, J., concurred.