# IN THE SUPREME COURT OF CALIFORNIA

J.O.,
Petitioner,

v.

THE SUPERIOR COURT OF SAN JOAQUIN COUNTY,
Respondent;
SAN JOAQUIN COUNTY PUBLIC CONSERVATOR,
Real Party in Interest.

S287285

Third Appellate District
C102071

San Joaquin County Superior Court
STK-MH-LPSC-2016-0000110

May 28, 2026

Justice Groban authored the opinion of the Court, in which Chief Justice Guerrero and Justices Corrigan, Liu, Kruger, Evans, and Brown* concurred.

---

\* Presiding Justice of the Court of Appeal, First Appellate District, Division Four, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

J.O. v. SUPERIOR COURT

S287285


Opinion of the Court by Groban, J.


"In order to lay a due foundation for that separate and distinct exercise of the different powers of government, which to a certain extent is admitted on all hands to be essential to the preservation of liberty, it is evident that each department should have a will of its own . . . . [¶] . . . But the great security against a gradual concentration of the several powers in the same department, consists in giving to those who administer each department the necessary constitutional means and personal motives to resist encroachments of the others." (Madison, The Federalist Papers: No. 51 (Feb. 8, 1788).)[1] This case requires us to confront this very principle.

Code of Civil Procedure[2] section 170.6 states that any party or attorney can compel the disqualification of a judge simply by signing an affidavit or orally stating under oath that the judge is "prejudiced" against the party, attorney, or their

---

[1]    Available at Lillian Goldman Law Library, The Avalon Project, <https://avalon.law.yale.edu/18th_century/fed51.asp#: ~:text=In%20order%20to%20lay%20a,the%20principle%20mus t%20be%20admitted> [as of May 28, 2026].   All Internet citations in this opinion are archived by year, docket number, and case name at <https://courts.ca.gov/opinions/cited-supreme-court-opinions>.

[2]    All further statutory references are to the Code of Civil Procedure unless otherwise specified.

1

respective interests. If the motion is timely and properly presented, the disqualification is automatic and a new judge must be assigned without any judicial inquiry into the veracity of the affidavit or oral statement. (See *Solberg v. Superior Court* (1977) 19 Cal.3d 182, 194 (*Solberg*).) Since the enactment of section 170.6, reports of its abuse have been well chronicled, including that section 170.6 has been invoked for the improper purposes of " 'judge-shopping,' " to delay proceedings, to disqualify a judge based on his or her "views on the law or on the exercise of judicial discretion" or his or her "personality traits" (*Solberg*, at p. 194), to "intimidate, punish, and/or silence" a judge for an adverse ruling and warn other judges not to rule similarly (*People v. Superior Court (Tejeda)* (2016) 1 Cal.App.5th 892, 930 (*Tejeda*)), or even as a vehicle for racial discrimination (see *People v. Williams* (1992) 8 Cal.App.4th 688, 706–707 (*Williams*)). These problems are particularly pronounced when challenges are improperly lodged in a blanket fashion. If, for example, a district attorney's or public defender's office engages in the practice of removing a judge from all cases or a substantial portion of cases on a bad-faith basis, or all cases or a substantial portion of cases of a particular type, the office can effectively control the extent to which that judge hears such cases. Such practices can even force a judge out of a particular judicial assignment altogether. The allegations here are illustrative. Petitioner J.O. contends that after Judge Erin E. Guy Castillo admonished an attorney from the San Joaquin County Office of the Counsel (County Counsel) for actions that were improper, County Counsel blanket disqualified Judge Guy Castillo in all conservatorship cases, filing an estimated 325 challenges in the span of less than four months. Petitioner

asserts this alleged blanket policy eventually required that Judge Guy Castillo be reassigned to a different department.

We considered the risk that blanket challenges pose to judicial independence almost five decades ago in *Solberg*, *supra*, 19 Cal.3d 182. In *Solberg*, a majority of this court reaffirmed its strong disapproval of blanket challenges but nevertheless concluded that such abuses did not violate the separation of powers doctrine because they do not " 'substantially impair' . . . the exercise of the constitutional jurisdiction of the trial courts." (*Id.* at p. 204.) We made clear that such an inquiry required us to assess conditions at the time and also made clear that those conditions might change in the future. (*Ibid.*) We observed that section 170.6 had to accommodate "competing interests of bench, bar, and public on the subject of judicial disqualification" and the Legislature might have to make "future adjustments to this sensitive balance." (*Solberg*, at p. 204.) But in 1977, we concluded that blanket challenges to judges under section 170.6 did not unconstitutionally interfere with the core functions of the judicial branch. (*Solberg*, at p. 204.)

In the almost 50 years since *Solberg* was decided, the judiciary has changed dramatically and, as a result, it is now time to reconsider *Solberg*'s logic with respect to blanket challenges. Since 1977, California's superior courts have seen a sharp increase in caseloads and case complexity. The judiciary has also seen the adoption of many sweeping new laws, as well as the rise of numerous specialty courts and specialty proceedings, requiring the assignment of dedicated judges to handle these specialized calendars. Given these changing demands, if "a party or attorney" (§ 170.6, subd. (a)(1)) can effectively force a judge from an assignment or department by blanketly abusing the terms of section 170.6, then such use of

the statute can " 'substantially impair' " (*Solberg*, *supra*, 19 Cal.3d at p. 204) the effective administration of justice within today's court system. If a party does not like a ruling made by a particular judge, blanket abuses of section 170.6 give the party the power to essentially force the presiding judge to reassign the judge or, at a minimum, to sideline the judge from a particular assignment until the party decides that the judge is acceptable. The mere threat of blanket abuses could cause litigants to question the impartiality of the judicial system as a whole, as they may be understandably concerned that judges might feel pressure to rule in a particular manner to avoid reassignment.

Courts of Appeal have criticized *Solberg*'s approach to blanket challenges and called for this court to reconsider *Solberg*'s analysis in view of current judicial conditions. (See *Tejeda*, *supra*, 1 Cal.App.5th at p. 910; see also *NutraGenetics, LLC v. Superior Court* (2009) 179 Cal.App.4th 243, 259–260 (*NutraGenetics*).) Commentators have critiqued abuses of judicial "peremptory" challenges. (See, e.g., Note, *Perfecting the Judicial Peremptory Challenge: A New Approach Using Preliminary Data on California Judges in 2021* (2024) 97 So.Cal. L.Rev. 253 (hereafter Note); Smith, *Papering Justices* (2025) 50 BYU L.Rev. 681; Comment, *Automatic Judicial Disqualification Under Idaho Criminal Rule 25(a): A Necessary Lawyering Tool or Potential Nuclear Weapon?* (2006) 43 Idaho L.Rev. 239 (hereafter Comment).) There have been increasingly troubling reports around the state about the use of section 170.6 to improperly challenge judges based on their prior rulings and perceived judicial philosophies, not on a good faith belief in prejudice. (See Committee on Revision of the Penal Code (hereafter Committee), Staff Memorandum 2025-04: Automatic Disqualifications of a Judge and Related Matters (May 16, 2025)

pp. 6–7 [and newspaper articles cited therein].) In its amicus curiae brief, the California Judges Association explains that concerns about blanket challenges have risen to such a degree that the Committee on Revision of the Penal Code has called for reforms to "curb abuse of this rule." (*Id.* at p. 9.) The Committee staff concluded that, "[b]ecause blanket challenges present serious threats to judicial independence and the administration of justice, abuses of the practice should not be allowed." (Committee, Staff Memorandum 2025-10: Updates on Staff Research and Preliminary Proposals: Gender Bias, Retroactivity, and 170.6 Disqualifications (July 17, 2025) p. 6.) Moreover, in the wake of *Solberg*, other states have prohibited blanket abuses of similar judicial disqualification statutes that pose a risk to judicial independence. (See *State of Minnesota v. Erickson* (1999) 589 N.W.2nd 481, 483 (*Erickson*); *State of Arizona v City Court of Tucson* (1986) 150 Ariz. 99, 102–103 (*City of Tucson*); *People ex rel. Baricevic v. Wharton* (1990) 136 Ill.2d 423 (*Baricevic*).)

In light of the additional information presented and the different demands facing California's judiciary since *Solberg* was decided, we must now reconsider its relevant logic. The nature and sheer scale of petitioner's allegations in this matter, over 300 section 170.6 challenges to Judge Guy Castillo in specialized proceedings in less than four months, confirm that we need to rethink *Solberg*'s approach to blanket challenges. We do not here question the facial constitutionality of section 170.6's "efficient and discreet procedure" (*Solberg*, *supra*, 19 Cal.3d at p. 204) when used as intended but overrule *Solberg* to the extent it concluded that *blanket abuses* of section 170.6 are immune from as-applied challenges on separation of powers grounds. Instead, we hold that if a party timely objects to a

section 170.6 motion and makes a prima facie showing that the motion's proponent is lodging bad faith blanket challenges against a judge, a court may look beyond the section 170.6 affidavit or oral statement and inquire into the legitimacy of the party's assertions of prejudice. Since the trial court here concluded that petitioner's separation of powers objection to County Counsel's alleged blanket challenges to Judge Guy Castillo was barred under *Solberg*, it had no occasion to consider the substance of his allegations; the Court of Appeal then summarily denied writ relief. Under these circumstances, we remand the cause to the Court of Appeal to consider whether any further proceedings are necessary in light of our opinion.[3]

## I. PROCEDURAL HISTORY

Petitioner is subject to a conservatorship. The San Joaquin County Public Conservator, represented by County Counsel, is his conservator. On August 9, 2024, County Counsel filed a section 170.6 motion to remove Judge Guy Castillo from petitioner's case, which Judge Guy Castillo granted on August 12, 2024. Thereafter, on August 14, 2024, petitioner filed an opposition to County Counsel's "blanket 170.6" motions, asserting that "[s]aid motions are filed indiscriminately in all cases" set before Judge Guy Castillo.[4] In his opposition,

---

[3] We note that Judge Guy Castillo's apparent reassignment does not make the issue moot because the operative disqualification order may still be vacated if petitioner ultimately prevails.

[4] We granted and held for the instant matter four additional petitions for review arising from identical allegations of County Counsel's blanket challenges under section 170.6 to Judge Guy

petitioner alleged that these " 'blanket' filings commenced" after a deputy county counsel attorney "was admonished [by Judge Guy Castillo]" for improper conduct in a matter "on or before May 17, 2024." Petitioner asserts that "County Counsel [was] endeavoring to force the bench to remove Judge Guy Castillo from her court assignment through the use of a 'blanket 170.6' because they are being held accountable for their actions." Petitioner argued that County Counsel's blanket challenges unconstitutionally threatened judicial independence.

According to petitioner, in August of 2024, Judge Guy Castillo was reassigned from the department hearing most mental health and conservatorship matters to a different department "where she currently hears misdemeanor cases, traffic infraction cases, small claims cases, unlawful detainer cases, restraining order cases, and expungement cases." The Honorable Kristine Eagle took over Judge Guy Castillo's previous assignment. Petitioner's counsel estimates "that, between the time that the County Counsel began 'blanket' section 170.6 motions against Judge Guy Castillo to the time that Judge Guy Castillo was reassigned, the County Counsel filed about 325 section 170.6 motions against her."

On September 16, 2024, Judge Eagle denied petitioner's opposition to County Counsel's "blanket 170.6," citing *Solberg*, *supra*, 19 Cal.3d 182. However, Judge Eagle observed that, "[i]f the public defendant [*sic*] seeks to advocate for a change in the

---

Castillo. (See *J.L. v. Superior Court*, review granted Dec. 18, 2024, S287240; *I.P. v. Superior Court*, review granted Dec. 18, 2024, S287247; *C.R. v. Superior Court*, review granted Dec. 18, 2024, S287284; *J.R. v. Superior Court*, review granted Dec. 18, 2024, S287269.)

law . . ., the Court thinks that's an entirely reasonable route to take."

Petitioner thereafter filed a petition for writ of mandate in the Court of Appeal. In petitioner's writ petition, he agreed that the trial court's ruling was compelled by *Solberg*, but he sought an opinion from the Court of Appeal urging us to revisit *Solberg*'s reasoning with respect to blanket challenges. The Court of Appeal summarily denied writ relief and petitioner sought our review.

## II.    DISCUSSION

### A. Section 170.6 and *Solberg*'s Separation of Powers Analysis

Section 170.6 provides that if any party or attorney makes a timely motion to disqualify a judge, supported by an affidavit or oral statement under oath that the judge is prejudiced against such party or attorney or the interest thereof, "the judge must recuse himself without further proof and the case must be reassigned to another judge." (*Solberg*, *supra*, 19 Cal.3d at p. 187; see generally § 170.6; see also *Barrett v. Superior Court* (1999) 77 Cal.App.4th 1, 4 ["Where a disqualification motion is timely filed and in proper form, the trial court is bound to accept it without further inquiry"]; *La Seigneurie U.S. Holdings, Inc. v. Superior Court* (1994) 29 Cal.App.4th 1500, 1505 ["a court should (provided a party has complied with the conditions set forth in the statute) grant a disqualification motion — even if the court suspects that the party has abused its right to utilize section 170.6"].) We have referred to the right to disqualify a judge under section 170.6 as " ' "automatic" ' " (*Solberg*, at p. 193) and a trial court's obligation to grant a complying petition as "mandatory" (*McCartney v. Commission on Judicial*

*Qualifications* (1974) 12 Cal.3d 512, 532 (*McCartney*)). "It is well recognized that in enacting . . . section 170.6 the Legislature guaranteed to litigants an *extraordinary right* to disqualify a judge." (*Id.* at p. 531, italics added.)

In *Austin v. Lambert* (1938) 11 Cal.2d 73 (*Austin*), we determined that a prior judicial disqualification statute, former section 170.5, was unconstitutional. Unlike section 170.6, former section 170.5 did not contain an affidavit requirement; it permitted litigants to make "a peremptory challenge" (former § 170.5) to the assigned judge *without stating any reason* for the challenge. (See generally *ibid.*) We concluded that such a legislatively delegated, unchecked power to disqualify a judge amounted to an "unlawful interference with the constitutional . . . processes of the courts." (*Austin*, at p. 79.) We observed that "to put in the hands of a litigant uncontrolled power to dislodge without reason or for an undisclosed reason, an admittedly qualified judge from the trial of a case in which forsooth the only real objection to him might be that he would be fair and impartial in the trial of the case would be to characterize the statute not as a regulation but as a concealed weapon to be used to the manifest detriment of the proper conduct of the judicial department." (*Ibid.*)

Years later, in 1957, the Legislature enacted section 170.6, which, inter alia, added an affidavit requirement; it was identical to the current version of section 170.6 except that it only applied to civil actions and special proceedings. In *Johnson v. Superior Court* (1958) 50 Cal.2d 693 (*Johnson*), we upheld section 170.6 against a claim that the statute on its face unconstitutionally violated the separation of powers doctrine. (*Id.* at pp. 695–696.) The *Johnson* court acknowledged that section 170.6 might "be abused by parties seeking to delay trial

or to obtain a favorable judge," but that "was a matter to be balanced by the Legislature against the desirability of the objective of the statute" to mitigate judicial prejudice in cases where it might be difficult to prove a judge's actual bias. (*Johnson*, at p. 697.) Furthermore, we underscored that section 170.6 "contains safeguards designed to minimize such abuses" (*Johnson*, at p. 697), including limiting "each side" (§ 170.6, subd. (a)(4)) to one challenge, requiring a declaration under oath (*id.* at subd. (a)(2)), and providing time limits for making a challenge (*ibid.*). (See *Johnson*, at p. 697.) We rejected the argument that section 170.6 was no better than former section 170.5, which we declared unconstitutional in *Austin*, *supra*, 11 Cal.2d 73. (*Johnson*, at p. 698.) Former section 170.5 "differed materially" from section 170.6 in that it did not require "the person making the challenge to state the ground for his objection or to make a declaration under oath that the ground in fact existed." (*Johnson*, at p. 698.)

Nearly two decades after *Johnson* was decided, in *Solberg*, we were "called upon to reconsider [*Johnson*] in light of the experience with [section 170.6] during the intervening two decades and as applied here in a criminal context."[5] (*Solberg*, *supra*, 19 Cal.3d at p. 187.) *Solberg* "conclude[d] that the [facial] constitutionality of [section 170.6] should be reaffirmed," and also rejected the appellants' as-applied challenge to blanket abuses of section 170.6. (*Solberg*, at p. 187; *id.* at p. 196.) There, a deputy district attorney challenged a municipal court judge under section 170.6 in four pending criminal prostitution cases

---

[5] Section 170.6 was amended in 1959, after *Johnson* was decided, to apply to criminal actions. (See *Solberg*, *supra*, 19 Cal.3d at p. 201, fn. 20.)

and the judge refused to disqualify herself. (*Solberg*, at p. 187.) The municipal court and the challenged judge alleged the section 170.6 motions were improper " 'blanket challenges' motivated by prosecutorial discontent with [the judge's] prior rulings of law" and violated the separation of powers doctrine. (*Solberg*, at p. 188.) We rejected appellants' efforts at distinguishing *Johnson* and concluded that "[t]he experience of the ensuing years ha[d] added quantitatively but not qualitatively to our understanding of the problem." (*Solberg,* at p. 196.)

*Solberg* considered the appellants' claim that *Johnson* was distinguishable "because it ruled on the constitutionality of section 170.6 only in a civil setting." (*Solberg, supra*, 19 Cal.3d at p. 201.) Since the parties tend to be the same in criminal cases, with the district attorney representing the People and the public defender representing many defendants, appellants argued that " 'blanket challenges,' " or improper repeat challenges to the same judge, posed a much greater threat to judicial independence than was the case when section 170.6 was confined to civil cases. (*Solberg*, at p. 202.) We observed that blanket challenges to a judge in the criminal context can "force [the judge's] removal from the criminal bench and his reassignment to a civil department." (*Ibid*.) While we reaffirmed our strong disapproval of blanket challenges, the *Solberg* majority concluded that the Legislature foresaw their risk and the practice did not "distinguish the present criminal proceeding from *Johnson*." (*Id*. at p. 204.) The majority "conclude[d] that to the extent that abuses persist in the utilization of section 170.6 they do not, in our judgment, 'substantially impair' or 'practically defeat' the exercise of the constitutional jurisdiction of the trial courts. Rather, it may be

helpful to view them as a relatively inconsequential price to be paid for the efficient and discreet procedure provided in section 170.6." (*Ibid.*) In sum, section 170.6 reasonably accommodated the "competing interests of bench, bar, and public on the subject of judicial disqualification," but "future adjustments to this sensitive balance" by the Legislature could become necessary. (*Solberg*, at p. 204.)

In a concurring and dissenting opinion, Acting Chief Justice Tobriner disagreed with the majority's belief "that the judiciary is helpless to prevent" abuses of section 170.6 in the form of blanket challenges. (*Solberg*, *supra*, 19 Cal.3d at p. 205 (conc. & dis. opn. of Tobriner, Acting C. J.).) In Justice Tobriner's view, the municipal court judge properly rejected the deputy district attorney's disqualification motions because the record demonstrated that they derived from a blanket policy based on dissatisfaction with the judge's prior rulings, as opposed to "a good faith belief in her 'prejudice.' " (*Id.* at p. 206.) Under such circumstances, the express requirement of section 170.6 that the disqualification motion be "duly presented" (§ 170.6, subd. (a)(4)) is necessarily violated and the judiciary should not be "powerless to prevent such an abusive exercise of the disqualification procedure." (*Solberg*, at p. 207 (conc. & dis. opn. of Tobriner, C. J.).)

In 2016, in *Tejeda*, *supra*, 1 Cal.App.5th 892, after Judge Thomas Goethals found that the Orange County District Attorney's Office committed misconduct in a high-profile murder case, the district attorney's office began issuing section 170.6 challenges against him regularly. Between the time of the adverse ruling in February 2014 and September 2015, the district attorney challenged Judge Goethals in 46 out of 49 murder cases that were assigned to him. When the district

attorney challenged Judge Goethals in the *Tejeda* case, Judge Richard M. King denied the challenge, finding it to be part of an improper pattern of blanket challenges that substantially interfered with the court's administration of justice. (See *Tejeda*, at pp. 897–899.) The *Tejeda* majority granted writ relief and reversed, directing the trial court to assign "this case to a judge other than Judge Goethals." (*Id.* at p. 911.) The *Tejeda* majority found itself bound by *Solberg*'s conclusion that section 170.6 is constitutional as applied to blanket challenges. (See *Tejeda*, at pp. 905–907.)

Despite concluding that *Solberg* was binding authority, the *Tejeda* majority criticized our reasoning in *Solberg* in several respects and questioned "whether *Solberg* overreached in its separation of powers analysis with regard to the specific problem of blanket challenges in criminal law cases" (*Tejeda, supra*, 1 Cal.App.5th at p. 908, fn. 6) and whether its relevant reasoning could still apply to "the current reality of the justice system." (*Id.* at p. 908.) The *Tejeda* majority urged this Court to revisit *Solberg*'s reasoning with respect to blanket abuses of section 170.6. (See *Tejeda*, at pp. 907–910.) We do so now.

## B. *Solberg*'s Reasoning Warrants Reconsideration

County Counsel argues that we "should not revisit *Solberg* because doing so risks undermining stability in judicial disqualification law, interferes with legislative prerogatives, and fails to address the root causes of modern judicial challenges."

County Counsel's concerns about decisional consistency are well-taken. We do not lightly depart from our own precedent. "Stare decisis plays a vitally important role in our work as a common law court; the policy of adherence to

precedent ensures the certainty, stability, and predictability on which the rule of law depends." (*People v. Hardin* (2024) 15 Cal.5th 834, 850.) However, "[w]e have recognized that reexamination of precedent may become necessary when subsequent developments indicate an earlier decision . . . has become ripe for reconsideration." (*In re Jaime P.* (2006) 40 Cal.4th 128, 133.) County Counsel acknowledges that "circumstances such as increased caseloads and budget constraints have evolved," but asserts that such changes "do not fundamentally alter the principles underpinning *Solberg*." According to County Counsel, "[i]ncreased use of section 170.6 reflects broader systemic issues (e.g., resource shortages or prosecutorial strategy)" that "should be addressed through broader reforms, not by destabilizing *Solberg*."

We disagree. *Solberg* itself contemplated an evolving approach to section 170.6 that necessarily considered conditions at the time the challenge was brought. In its first paragraph, *Solberg* explained that the court was assessing whether *Johnson*'s conclusion that section 170.6 does not interfere with judicial independence should be reconsidered "in light of the experience with the statute during the intervening two decades." (*Solberg*, *supra*, 19 Cal.3d at p. 187; see *id.* at p. 186, citing *Johnson*, *supra*, 50 Cal.2d 693.) In a later analysis of whether abuses of section 170.6 " 'substantially impair[ed]' " judicial operations at the time, *Solberg* observed that section 170.6 had to accommodate "competing interests of bench, bar, and public on the subject of judicial disqualification" and the Legislature might have to make "future adjustments to this sensitive balance." (*Solberg*, at p. 204.)

Against this backdrop, we now must reevaluate *Solberg*'s approach to blanket abuses of section 170.6.

### C. Separation of Powers Principles

The separation of powers clause in the California Constitution provides: "The powers of state government are legislative, executive, and judicial. Persons charged with the exercise of one power may not exercise either of the others except as permitted by this Constitution." (Cal. Const., art. III, § 3.) The doctrine limits "the authority of one of the three branches of government to arrogate to itself the core functions of another branch. Although the doctrine does not prohibit one branch from taking action that might affect another, the doctrine is violated when the actions of one branch defeat or materially impair the inherent functions of another." (*Steen v. Appellate Division of Superior Court* (2014) 59 Cal.4th 1045, 1053 (*Steen*).) "The primary purpose of the separation of powers doctrine ' "is to prevent the combination in the hands of a single person or group of the basic or fundamental powers of government[,]" ' [citation], as well as to avoid overreaching by one governmental branch against another." (*Case v. Lazben Financial Co.* (2002) 99 Cal.App.4th 172, 183 (*Case*).)

The California Constitution vests the judicial power of the state in our court, the Courts of Appeal, and the superior courts. (Cal. Const., art. VI, § 1.) "It is . . . a core judicial function 'to ensure the orderly and effective administration of justice.' " (*Case, supra,* 99 Cal.App.4th at p. 184.) Courts have " ' "the right to control [their] order of business and to so conduct the same that the rights of all suitors before them may be safeguarded." ' " (*People v. Engram* (2010) 50 Cal.4th 1131, 1148 (*Engram*), quoting *Lorraine v. McComb* (1934) 220 Cal. 753, 756, italics omitted.) " ' "This power has been recognized as judicial in its nature, and as being a necessary appendage to a court organized to enforce rights and redress wrongs." ' " (*Case,*

at p. 185.) In furtherance of such right, article VI, section 6 of the California Constitution establishes the Judicial Council, which is the policymaking body for the California courts. "To improve the administration of justice the [Judicial Council] shall survey judicial business and . . . adopt rules for court administration, practice and procedure . . . . The rules adopted shall not be inconsistent with statute." (Cal. Const., art. VI, § 6, subd. (d).) "Subject to the rules of the Judicial Council, the presiding judge shall distribute the business of the court among the judges, and prescribe the order of business." (Gov. Code, § 69508, subd. (a).) California Rules of Court, "[r]ule 10.603(c)(1) confirms the presiding judge 'has ultimate authority to make judicial assignments.' Rule 10.603(b)(1)(A) and (B) authorizes the presiding judge to '[a]ssign judges to departments,' 'designate supervising judges for divisions,' and '[a]pportion the business of the court, including assigning and reassigning cases to departments.'" (*Alvarez v. Superior Court* (2010) 183 Cal.App.4th 969, 978.)

### D. *Solberg*'s Assessment of the Impact of Blanket Abuses of Section 170.6 Is No Longer Viable

With these principles in mind, we now explain why *Solberg*'s conclusion in 1977 that blanket abuses of section 170.6 did not " 'substantially impair' or 'practically defeat' the exercise of the constitutional jurisdiction of the trial courts" (*Solberg*, *supra*, 19 Cal.3d at p. 204) is no longer tenable.

Today, California's superior courts look much different than they did nearly five decades ago, and blanket abuses of section 170.6 can now have an outsized impact on the judiciary's duty to effectively administer justice. Superior court case filings have significantly increased; for instance, in 1977, there were 54,653 felony criminal cases filed, whereas in the 2023 to 2024

fiscal year, there were 179,821 criminal felony filings. (See Nat. Center for State Courts, State Court Caseload Statistics: Annual Report 1977 (1982) p. 148; Judicial Council of Cal., 2025 Court Statistics Report: Statewide Caseload Trends (2025) p. 3.) In the midst of growing operational demands, the judicial branch has also been hampered by budget cutbacks. (See, e.g., Daniels, *California superior courts crisis* (2023) <https://www.ebsco.com/research-starters/law/california-superior-courts-crisis#full-article> [as of May 28, 2026] ["California Superior Courts have endured a period of being underfunded and understaffed, which has had dire consequences for the citizens of the state"]; *ibid.* ["After the state economy plunged in the 2000s due to the Great Recession, steep cuts were made to the judicial budget, creating the host of problems"]; National Association for Presiding Judges and Court Executive Officers, *California Budget Cuts: "All Courts are Going to Feel the Pain"* (May 14, 2012) <https://napco4courtleaders.org/2012/06/california-budget-cuts-all-courts-are-going-to-feel-the-pain/> [as of May 28, 2026] ["During the last three years, the state's huge court system has been cut by $650 million" and "State judicial leaders warned Monday that the proposed cuts for the California courts may jeopardize public access to the justice system"].) Additionally, the superior courts have been impacted by judge shortages. As the Legislature recently recognized, "judicial need" exceeds the number of superior court judgeships and "[i]n some counties, the existing disparity between authorized and funded positions and judicial need is expected to widen due to continued dramatic population growth in the future." (Stats. 2023, ch. 482, § 1, subds. (c), (d), adding Gov. Code, § 69614.5.) As of 2022, "17 courts need[ed] new judgeships, for a total need of 98 judges,"

including 30 judges in San Bernardino County, 22 judges in Riverside County, and 11 judges in Kern County. (Judicial Council of Cal., The Need for New Judgeships in the Superior Courts: 2022 Update of the Judicial Needs Assessment (Nov. 2022) p. 5 <https://courts.ca.gov/sites/default/files/courts/default/2024-12/report-to-the-legislature_2022-update-of-the-judicial-needs-assessment.pdf> [as of May 28, 2026]; *ibid.* at p. 6 [Table 2].) In Riverside County, judicial shortages led to the dismissal of hundreds of criminal cases. (See Coulter, *Hundreds of Riverside County criminal cases dismissed amid shortage of judges*, The Desert Sun (Oct. 25, 2022) <https://www.desertsun.com/story/news/crime_courts/2022/10/25/hundreds-riverside-county-criminal-cases-dismissed-amid-judge-shortage/10598314002/> [as of May 28, 2026].) These stressors all combine to create a situation that is very different from the one facing the *Solberg* court: today's court system handles a vast increase in case filings. But though the complexity of managing that system has increased, that system must navigate serious budget pressures and judicial shortages. In such a delicate judicial ecosystem, the impact of blanket abuses of section 170.6 to fundamentally alter judicial assignments becomes amplified. When a party utilizes section 170.6 to engage in the bad faith practice of removing a judge from all or a substantial portion of cases, or all or a substantial portion of cases of a particular type without a legitimate belief in the judge's prejudice toward the litigant, the court is forced to redistribute work amongst its limited judges at the cost of both judicial efficiency and independence across its entire caseload. (Accord *Erickson*, *supra*, 589 N.W.2d at p. 484 ["considering the broad impact of blanket filings, which affect not only the specific cases at issue, but also the cases of many of our other citizens that are pending

at the same time," and observing that blanket judicial disqualifications "greatly" affect the efficient utilization of judicial resources].) The court is busier and more under resourced than it was in 1977, making the impacts of blanket challenges far more severe.

In addition to superior courts' increase in workload and case complexity in the years since *Solberg* was decided, the California judiciary has seen a major shift in its approach to certain types of cases. This shift has necessitated greater judicial specialization, which is undermined if parties can abuse section 170.6 to force a specialized judge from his or her designated assignment. More specifically, the role of specialty courts, like juvenile dependency court and family court, has become increasingly prominent. (See, e.g., Edwards, Protecting Children and Reuniting Families (2008) p. 6 ["The juvenile dependency court was not a significant part of the workload of the California Superior Courts until after 1980"] <http://www.judgeleonardedwards.com/docs/HistofDepFINAL1 -13-09DB.pdf> [as of May 28, 2026]; Adam & Brady, *Fifty Years of Judging in Family Law: The Cleavers Have Left the Building* (2013) 51 Fam. Ct. Rev. 28, 28 ["Not until the 1970s did the movement for a separate court to handle family law cases really gain momentum. The huge increase in cases and the development of a significant body of case law about the family has led most states to develop dedicated family law benches, designed to deal effectively and appropriately with the complex issues facing families dealing with divorce and parental separation"].) Moreover, there has been a marked increase in "[p]roblem-solving courts (or collaborative justice courts) includ[ing] specialized drug courts, domestic violence courts, community courts, family treatment courts, DUI courts, mental

health courts, peer/youth courts and homeless courts," which "seek to use the authority of courts to improve outcomes for victims, communities and defendants." (Judicial Council of Cal., California's Collaborative Justice Courts: Building a Problem-Solving Judiciary (2005) p. 2 <https://courts.ca.gov/sites/default/files/courts/default/2024-08/california_story.pdf> [as of May 28, 2026].)  California now "has more than 400 collaborative courts in all but three small jurisdictions, with many jurisdictions having four or more types of collaborative courts.  The most numerous types of collaborative courts include adult drug courts (84), adult mental health courts (55), veterans' courts (47), dependency drug courts (35), juvenile drug courts (24), DUI courts (22), reentry courts (20), homeless courts (18), community courts (12), and juvenile mental health courts (12).  Newer courts such as girls' courts and CSEC courts for commercially sexually exploited children are also growing." (California Association of Collaborative Courts, Court Finder <https://wearecacc.org/court-finder/> [as of May 28, 2026].)  Though collaborative courts are premised on cooperation and may not face blanket challenges with great frequency, they have fundamentally changed the way in which superior courts conduct their business and added complexity to the management of judicial assignments.  If section 170.6 can be weaponized to remove a dedicated judge from a specialized calendar, like juvenile dependency court and family court, then it can defeat the presiding judge's assignment authority (Cal. Rules of Court, rule 10.603(c)(1)) and "materially impair" (*Steen*, *supra*, 59 Cal.4th at p. 1053) the judiciary's right to conduct business so " ' "that the rights of all suitors before them may be safeguarded." ' " (*Engram*, *supra*, 50 Cal.4th at p. 1148, italics omitted; cf. Babb, *Fashioning an Interdisciplinary Framework*

*for Court Reform in Family Law: A Blueprint to Construct a Unified Family Court* (1998) 71 So.Cal. L.Rev. 469, 501 [judicial "[specialization provides] improved precision and predictability of adjudication; more accurate adjudication; more coherent articulation of legal standards; greater expertise of the bench; economies of scale that flow from division of labor, particularly including speed, reduced costs and greater efficiency through streamlining of repetitive tasks and wasted motions"].)

There have also been countless changes in the law since 1977 that similarly require judicial specialization. Blanket abuses of section 170.6 can materially undermine the effort to assign judges to courtrooms who possess particularized knowledge and training regarding these changes. Superior courts have been faced with both voter and legislative enactments that have generated entirely new proceedings, increased caseloads and case complexity, and have significantly altered the substantive law. These new laws require specialized knowledge for their implementation. Courts will not be able to optimize that specialized knowledge and experience if judges can be unfairly removed from all or a substantial portion of cases of a particular type. For instance, the Community Assistance, Recovery, and Empowerment (CARE) Act (Stats. 2022, ch. 319), which became effective in 2023, established a new program "to connect a person in crisis with a court-ordered CARE plan or agreement for up to 12 months" (California Health and Human Services Agency, CARE Act Overview (Aug. 2023) p. 1 <https://sf.courts.ca.gov/system/files/general/care_overview.pdf> [as of May 28, 2026]) and requires judicial officers to receive specialized training. (See Welf. & Inst. Code, § 5983, subd. (c).) Recently enacted Proposition 36 (Prop. 36, § 7, as approved by voters, Gen. Elec. (Nov. 5, 2024), eff. Dec. 18, 2024), requires

courts to establish "detailed treatment program[s]" for certain qualifying drug offenders. (Health & Saf. Code, § 11395, subd. (d)(1)(A).) Similarly, pretrial diversion programs, which require ongoing court supervision, have been expanded for certain individuals; these programs include primary caregiver diversion (Pen. Code, § 1001.83), drug diversion (Pen. Code, § 1000), mental health diversion (Pen. Code, § 1001.36), military diversion (Pen. Code, § 1001.80), and misdemeanor diversion (Pen. Code, § 1001.95). The Safe Neighborhoods and Schools Act of 2014 reclassified certain nonserious, nonviolent offenses from felonies to misdemeanors and permitted offenders to petition the superior court to redesignate their felony convictions to misdemeanors and reduce their sentences. (See Pen. Code, § 1170.18.) The Criminal Justice Realignment Act of 2011 "significantly change[d] the punishment for some felony convictions." (*People v. Scott* (2014) 58 Cal.4th 1415, 1418.) The Three Strikes Reform Act of 2012 (Prop. 36, as approved by voters, Gen. Elec. (Nov. 6, 2012)) reduced punishment for certain Third Strike offenders and permitted already convicted offenders to seek resentencing under its terms. (See Pen. Code, § 1170.126.) The California Racial Justice Act of 2020 (Stats. 2020, ch. 317, § 1), effective January 1, 2021, enacted sweeping changes to our criminal law in an effort to address " 'the unfortunate effects of centuries of racial discrimination.' " (Stats. 2020, ch. 317, § 2, subd. (b).) The Racial Justice Act now permits individuals to seek relief in the superior courts if race played a role in their charging, conviction, or sentencing. (See Pen. Code, § 745; Stats. 2022, ch. 739, § 1 [extending the Racial Justice Act to existing judgments "[t]o ensure equal access to justice for all"].) Senate Bill No. 1437 (2017–2018 Reg. Sess.) (Stats. 2018, ch. 1015) changed the criteria for murder liability

(see Pen. Code, §§ 188, subd. (a)(3), 189, subd. (e), as amended by Stats. 2018, ch. 1015, §§ 2, 3) and "also added section 1170.95 to the Penal Code [now Penal Code section 1172.6], which creates a procedure for convicted murderers who could not be convicted under the law as amended to retroactively seek relief." (*People v. Lewis* (2021) 11 Cal.5th 952, 957, fn. omitted.) Penal Code section 1172.6 was subsequently amended to also apply to those convicted of attempted murder under the natural and probable consequences doctrine and manslaughter, with recognition of the "potentially-major" impact this would have on courts "likely to receive an influx of petitions." (Sen. Com. on Appropriations, Rep. on Sen. Bill No. 775 (2021–2022 Reg. Sess.) as amended Feb. 19, 2021, p. 1; see Pen. Code, § 1172.6, subd. (a).) Assembly Bill No. 333 (2021–2022 Reg. Sess.) amended Penal Code section 186.22 to require proof of additional elements to establish a gang enhancement. (Assem. Bill No. 333, § 3, eff. Jan. 1, 2022.) These are massive changes to the law, requiring corresponding changes to our court administration. These new laws have significantly altered the volume and nature of superior courts' " ' "order of business" ' " (*Engram*, *supra*, 50 Cal.4th at p. 1148, italics omitted) in a manner that has elevated the importance of the judiciary's "ultimate authority" (Cal. Rules of Court, rule 10.603(c)(1)) to control its business through the assignment of judges.

In sum, given how the California judicial system has evolved since 1977, blanket abuses of section 170.6 now unconstitutionally interfere with the " 'effective administration of justice' " — a "core judicial function" of court administration — by permitting a party to unilaterally decide, for improper reasons, that a judge cannot oversee all or a substantial portion of cases, or all or a substantial portion of

cases of a particular type, to which he or she is assigned. (*Case*, *supra*, 99 Cal.App.4th at p. 184; see Cal. Rules of Court, rule 10.603(c)(1) ["The presiding judge has ultimate authority to make judicial assignments"].) Today's judiciary is faced with heightened budgetary constraints and judicial shortages, it has seen the proliferation of specialized courts, and it has witnessed sweeping changes to our procedural and substantive law. In this context, the judiciary's responsibility to oversee the " 'effective administration of justice' " is made unacceptably harder if a judge can be effectively barred from hearing all or a substantial portion of assigned cases at the whim of a party. Contrary to County Counsel's suggestion, blanket abuses of section 170.6 present far more than a mere "administrative" burden or "personnel management" issue, they prove unconstitutionally injurious to the judiciary's performance of its "adjudicative function."

Consider the allegations here. The presiding judge in San Joaquin County Superior Court might have determined that the court and litigants were best served by assigning Judge Guy Castillo to the department dedicated to conservatorship matters. If, as alleged, County Counsel, after being admonished by Judge Guy Castillo, abused section 170.6 to blanket disqualify her in all conservatorship cases (over 300 cases in less than four months) and force her reassignment to a different department, then County Counsel's use of section 170.6 could "materially impair," if not entirely defeat (*Steen*, *supra*, 59 Cal.4th at p. 1053), the presiding judge's assignment authority. The potential consequences of blanket abuses are particularly acute where the judge, like Judge Guy Castillo, is overseeing a specialized calendar, or assigned to a specialized court or department. And one judge's forced reassignment from

certain types of cases, or from a particular department, will inevitably have negative spillover effects for the court as a whole.

In smaller counties, like Mariposa County or Del Norte County, where there are only two judges for the entire county (Gov. Code, §§ 69588.3, 69582.3), the risk of interference from blanket challenges is even more pronounced since it would likely require the other sitting judge to hear such matters, thereby enabling a party to essentially preselect its judge. Even in larger counties, where work might be more easily redistributed amongst judges when one judge is repeatedly challenged, the impacts of blanket challenges can be equally disruptive. For instance, Orange County has over 100 judges and is among those counties with the highest number of judicial officers. (See Gov. Code, § 69591; see generally Gov. Code, §§ 69580–69620.) Nevertheless, in *Tejeda*, *supra*, 1 Cal.App.5th at page 898, the Orange County Superior Court described the " 'crisis' " created by the district attorney's blanket challenges to Judge Goethals. According to the respondent court, " 'Six months after the People began disqualifying Judge Goethals, the negative impact became readily apparent,' " as the court had a growing backlog of murder cases, as well as an increasing backlog in " 'shorter felony cases because [short cause judges] were presiding over two-to-three-week murder trials.' " (*Ibid.*) The blanket challenges to Judge Goethals caused cases of all types " 'to languish unnecessarily' " (*ibid.*) at the expense of " 'the court's responsibility to ensure the orderly administration of justice,' " but *Solberg* prevented the Orange County Superior Court from stopping the blanket practice. (*Tejeda*, at p. 899.)

The nature and sheer scale of petitioner's allegations in this matter further confirm the extent of the problem.

Petitioner alleges County Counsel lodged section 170.6 challenges against Judge Guy Castillo in over 300 specialized conservatorship proceedings in less than four months, forcing her reassignment to a different department handling, inter alia, misdemeanor and traffic cases. While we take no view on the truth of petitioner's allegations, the number of alleged challenges to Judge Guy Castillo in her specialized assignment supports our conclusion that blanket abuses of section 170.6 pose a clear and unacceptable risk of interfering with court operations. The judiciary should no longer be helpless to remedy the problem of blanket abuses. (Accord *Baricevic*, *supra*, 136 Ill.2d at p. 435 [addressing alleged blanket challenges to a judge by the state prosecutor under Illinois's analogous judicial disqualification statute and concluding, "where the independence of the judiciary is endangered by encroachment from the other branches of government, this court has a duty to act"].)

We are not alone in recognizing the now heightened threat that blanket challenges to a particular judge under section 170.6 can pose to the constitutional jurisdiction of today's superior courts. Since *Solberg*, there has been increasing recognition of the fact that blanket challenges to a judge can materially interfere with judicial operations. Courts of Appeal have questioned *Solberg*'s "efficacy in the context of the current reality of the justice system" (*Tejeda*, *supra*, 1 Cal.App.5th at p. 908) and "wish[ed] [they] could do more to stop" abuses of section 170.6 (*NutraGenetics*, *supra*, 179 Cal.App.4th at p. 259). There have been increasingly troubling reports about abuses of section 170.6 to remove judges from cases for reasons other than a good faith belief in prejudice. In its amicus curiae brief here, the California Judges Association asserts that abuses of section

170.6 are "pervasive" and government attorneys' improper use of section 170.6 has given rise to a "constitutional crisis" garnering the attention of the Committee on Revision of the Penal Code. Staff from the Committee on Revision of the Penal Code recently proposed that section 170.6 be amended "to prohibit or curtail blanket peremptory judicial disqualification" since blanket challenges threaten judicial independence. (Committee, First Supplement to Memorandum 2025-04: Automatic Disqualifications of a Judge and Related Matters (May 22, 2025) p. 2 [of Judge Daniel P. Maguire's submission]; *ibid.* [among the "deleterious effects" necessitating section 170.6's reform are the "[u]surpation of the presiding judge's statutory authority to make assignments" and "[d]egradation of judicial independence"]; see also Riff, *It's time to deep six the "6"*, Daily Journal (Nov. 13, 2025) at p. 4 [calling for the repeal of section 170.6 on several grounds, including that "the 170.6 process is a serious affront to judicial independence in the face of institutional 'blanket' challenges to a judicial officer," which contravene "the presiding judges' authority to make judicial assignments in the best interests of the court"]; Kane, *CCP 170.6 Should Be Repealed* (Summer 2002) vol. 11, No. 3, ABTL Report 10 [advocating for the repeal of section 170.6 in part because "section 170.6 diminishes respect for the institution of our trial courts. It reduces the appearance of impartiality in making judicial assignments of cases because it allows the litigants to manipulate that process"].)

Notably, California is "in a shrinking minority of states — currently only 5 other states allow blanket challenges — that permit this practice." (Committee, Staff Memorandum 2025-10: Updates on Staff Research and Preliminary Proposals: Gender Bias, Retroactivity, and 170.6 Disqualifications, *supra*, at p. 6;

cf. Comment, *supra*, 43 Idaho L. Rev. at p. 242 ["A *significant minority* of states have adopted statutes or court rules that . . . allow[] peremptory or automatic judicial disqualifications" (italics added)].) Since *Solberg*, the high courts in three states have invalidated blanket challenges pursuant to similar judicial disqualification statutes. (See *City of Tucson, supra,* 150 Ariz. 102 [holding that an Arizona city prosecutor's blanket disqualifications of a magistrate judge in all DUI cases undermined judicial independence]; *Baricevic, supra,* 136 Ill.2d at p. 434 [where there was evidence to suggest the State Attorney was using Illinois's disqualification statute "to coerce the chief judge . . . to reassign" a judge, the court permitted judicial scrutiny of the peremptory challenges]; *Erickson, supra,* 589 N.W.2d 481 [prohibiting the prosecutor's blanket abuse of Minnesota's judicial disqualification statute].) States have also taken action, by rule of court or statute, to protect against improperly motivated blanket judicial disqualifications. (See, e.g., Or. Rev. Stat. § 14.260(7)(a) [challenged judge may request a hearing "[i]f a party, attorney, law firm, district attorney's office, defense consortium or public defender's office files a motion or series of motions . . . that effectively denies the judge assignment to a criminal or juvenile delinquency docket"]; Ariz. Rule of Crim. Proc. 10.2(b)(1), (2)(E) [each side in a criminal case is entitled to one peremptory challenge of a judge if accompanied by an "avowal that the party is making the request . . . not for [the] improper purpose" of "using the rule against a particular judge in a blanket fashion"].) Commentators have repeatedly warned of the dangers of permitting judicial "peremptory" challenges given their risk of abuse: "They argue that marginal improvements to judicial accountability do not warrant sacrificing judicial independence and integrity." (Note*, supra,*

97 So.Cal. L.Rev. at p. 277; see also Comment, *supra*, 43 Idaho L.Rev. at p. 264 ["courts . . . need to protect judges and the judiciary as a whole from outside influence, such as pressure by prosecutor's and public defender's offices exerted through blanket peremptory judicial disqualifications"].) Moreover, as evidenced by the allegations here and in other pending matters,[6] our courts seem to be encountering claims of blanket abuses of section 170.6 with increasing regularity.

As we have said before, " '[w]e cannot permit a device intended for spare and protective use to be converted into a weapon of offense . . . .' " (*Solberg*, *supra*, 19 Cal.3d at p. 198, quoting *McClenny v. Superior Court* (1964) 60 Cal.2d 677, 689.) If section 170.6 can be abused in a blanket fashion for reasons other than a good faith belief in a judge's prejudice in a particular case, i.e., for purposes of " 'judge-shopping,' " to delay proceedings, to disqualify a judge based on his or her "views on the law or on the exercise of judicial discretion" or his or her "personality traits" (*Solberg*, *supra*, 19 Cal.3d at p. 194; see *id.* at pp. 195–196), to " 'intimidate, punish, and/or silence' " a judge for an adverse ruling and warn other judges not to rule similarly (*Tejeda*, *supra*, 1 Cal.App.5th at p. 930), or, worse yet, on the basis of a racial or other group bias (see *Williams*, *supra*,

---

[6]     In *Hoglund v. Superior Court*, S291333, which we granted and held for this matter on August 30, 2025, the petitioner alleges that the San Francisco District Attorney has blanket challenged a judge before whom the district attorney has never appeared in an attempt "to reshape the San Francisco criminal court to be more favorable towards her agenda," not a good faith belief in prejudice.

8 Cal.App.4th 688),[7] then such use of section 170.6 can "materially impair" (*Steen, supra,* 59 Cal.4th at p. 1053) the "core judicial function 'to ensure the orderly and effective administration of justice.' " (*Case, supra,* 99 Cal.App.4th at p. 184.) This is far too consequential a price to be paid for section 170.6's efficient procedure.

We now agree with Justice Tobriner's ultimate conclusion that we are not powerless to act in the face of such an assault on the judiciary. To the contrary, our constitutional structure requires us to act. Few would accept, for example, that *Solberg*'s logic forecloses judicial inquiry into a claim that the prosecution unconstitutionally lodged a section 170.6 challenge on the basis of the judge's race. (See, e.g., *Williams, supra,* 8 Cal.App.4th 688.) Here, too, we can no longer endorse *Solberg*'s logic to immunize blanket challenges under section 170.6 from judicial inquiry when such challenges threaten the separation of powers. We therefore overrule *Solberg*'s reasoning to the extent it bars a

---

[7] See also Note, *supra,* 97 So.Cal. L.Rev. at page 258 ("Section 170.6 can . . . exacerbate the very problem it was designed to minimize. Bias is a two-way street in which litigants can *also* discriminate against judges of a particular gender, race, or ethnicity, among other demographics"); Committee, Staff Memorandum 2025-10: Updates on Staff Research and Preliminary Proposals: Gender Bias, Retroactivity, and 170.6 Disqualifications, *supra,* at page 6 ("In Yolo County, prosecutors blanket challenged the only Hispanic judge in the county and disqualified her from hearing felony criminal cases. Defense attorneys raised an equal protection challenge to the 170.6 disqualifications, but the Presiding Judge was forced to deny it without any record of intentional discrimination").

court from entertaining as-applied challenges to alleged blanket abuses of section 170.6 on separation of powers grounds.[8]

### E. Blanket Abuses of Section 170.6's Terms Invade the Province of the Judiciary

We now conclude, contrary to *Solberg*'s logic, that blanket abuses of section 170.6 materially impair judicial operations. However, that does not end our separation of powers inquiry. A separation of powers conflict necessarily requires two branches of government, one encroaching upon the other. (See, e.g., *Steen, supra,* 59 Cal.4th at p. 1053.) We solicited supplemental briefing from the parties on the question of whether blanket challenges to a particular judge under section 170.6 implicate separation of powers concerns only when the challenges are made by executive branch offices or may also be implicated when nonexecutive branch entities and private parties lodge blanket challenges. If it is the former, then only blanket challenges by executive actors would be subject to a separation of powers challenge. But if the statute itself encroaches on judicial functions when blanketly abused, then blanket challenges by any litigant could be challenged as an unconstitutional encroachment by the Legislature into judicial functions. The

---

[8] While our holding overrules *Solberg*'s logic in its entirety with respect to blanket abuses of section 170.6, we find it necessary to state that we are troubled by the observation in *Solberg* that such abuses of section 170.6 were "self-limiting" because they "may well . . . antagonize the remaining judges of the court." (*Solberg, supra,* 19 Cal.3d at p. 202.) We agree with the *Tejeda* majority that this reasoning "is [and always has been] offensive to the judiciary" by "assuming judges will [retaliate] in bad faith to overuse of the statute." (*Tejeda, supra,* 1 Cal.App.5th at pp. 909–910.)

parties and amici curiae are split on the proper characterization of the conflict at issue.

Petitioner, as well as amici curiae Law Offices of Marsanne Weese and the California Public Defenders Association, argue that only bad faith blanket challenges by executive agencies can unconstitutionally encroach on judicial functions because "entities that do not exercise executive power . . . are not capable of 'materially impairing' another branch's constitutional functions." They assert that nonexecutive agencies act on behalf of individuals, not a branch of government, and thus they cannot be the source of an inter-branch conflict proscribed by the separation of powers doctrine. The Public Defenders Association emphasizes that, unlike the prosecution, defense attorneys "represent one client at a time," to whom they owe a duty to ensure a fair hearing. As a result, any perceived "blanket" challenges to specific judges are "driven by" a public defender's "duties of loyalty and zealous advocacy" to his or her clients, not any office-wide policy concerns. Furthermore, the Public Defenders Association points out that a rule prohibiting blanket challenges from public defenders, who represent a large percentage of criminal defendants, could have a disparate impact on indigent defendants because a privately retained attorney for a single client is unlikely to have the capacity to challenge a judge *en masse*. The Law Offices of Marsanne Weese also notes that the district attorney is a party to almost every action, whereas "a public defender will rarely control the entire court calendar, because some defendants will retain private counsel . . . [or] be appointed alternative counsel."

County Counsel, amici curiae California District Attorneys Association and the California Judges Association contend that section 170.6 should be applied in the same way to

all entities "who regularly occupy a large portion of the court's calendar." The California Judges Association posits that "[t]he identity of the challenging party does not cure this constitutional defect since it is the legislative scheme itself that offends the separation of powers doctrine." According to amicus curiae California District Attorneys Association, "the public defender stands in nearly the same position" as the district attorney, "represent[ing] approximately 80 percent of all persons charged with felonies in California," and thus the public defender has an equal capacity to materially interfere with court operations by way of blanket challenges.

We agree with County Counsel, as well as amici curiae California District Attorneys Association and the California Judges Association, that the problem of judicial interference from blanket challenges derives from the legislative scheme itself and not just the activities of certain executive branch officers. More specifically, the legislatively adopted terms of section 170.6 prohibit inquiry into the veracity of timely and properly presented affidavits or oral statements under oath (see § 170.6, subd. (a)(4)), even when there is reason to believe that such affidavits are being blanketly abused. (Accord *Tejeda, supra*, 1 Cal.App.5th at pp. 912–913, fn. 2 (conc. opn. of Aronson, J.) ["the power or right at issue is one the Legislature created and delegated not only to the district attorney, but to all litigants and attorneys in any civil or criminal action . . . . It is the express terms of the statute that create the potential for undermining court functions"].) We therefore conclude "[t]he separation of powers conflict at issue . . . arises between the legislative and judicial branches." (*Id.* at p. 913, fn. 2 (conc. opn. of Aronson, J.); see also *id.* at p. 899 [quoting the trial court's order observing that " '[t]o allow a party to manipulate the court

into removing a judge from hearing certain criminal cases [by blanket abuse of section 170.6] — . . . would be a concession against judicial independence' "].) When section 170.6 is abused to challenge a particular judge in all or a substantial portion of his or her assigned cases, or all or a substantial portion of cases of a particular type, without a good faith belief in the judge's prejudice, such abuse of the statute "materially impair[s]" judicial operations (*Steen, supra,* 59 Cal.4th at p. 1053); this reality does not depend on the identity of the party lodging the blanket challenges. As such, blanket abuses of section 170.6 by any party may be subject to challenge on separation of powers grounds.

We recognize that, as a general matter, institutional parties like the district attorney or public defender pose a greater risk of interference with judicial operations because they appear with such frequency before the court. A district attorney who decides to exercise blanket challenges against a judge in a felony criminal assignment, for example, could essentially exclude that judge from all matters assigned to the judge. However, a private practitioner or law firm could also employ section 170.6 to unconstitutionally interfere with judicial operations. For example, a single law firm in a small county that handles the bulk of specialized matters in that field (e.g., unlawful detainers) "could interfere with the court's powers by exercising a blanket challenge to the only judge hearing cases involving that area of the law." (*Tejeda, supra,* 1 Cal.App.5th at p. 913, fn. 2 (conc. opn. by Aronson, J.).) And in any event, the separation of powers problem at issue here arises whenever a litigant engages in bad faith blanket challenges to avoid appearing before a judge, even if other judges remain available

to adjudicate cases involving that litigant.  The effect of such blanket challenges may differ in degree, but not in kind.

## F. The Opponent of a Section 170.6 Motion Must Establish a Prima Facie Case of Blanket Abuses

Since we have concluded, for the first time, that a court may consider a separation of powers objection to alleged blanket abuses of section 170.6, we must outline for trial courts the procedure for implementing this novel holding.  We, like the Illinois Supreme Court (see *Baricevic, supra*, 136 Ill.2d 423), find *Batson*'s burden shifting procedure for considering constitutional objections to peremptory challenges of prospective jurors to provide a helpful analogue.  (See *Batson v. Kentucky* (1986) 476 U.S. 79 (*Batson*); *Baricevic*, at pp. 437–440 [adopting a procedure "patterned after" *Batson* for addressing a separation of powers challenge to Illinois's analogous judicial disqualification statute].)  Indeed, "the procedure for scrutinizing peremptory challenges set forth in *Batson* represents an effort by the Supreme Court to rectify (and prevent) the unconstitutional use of a constitutional statute (*i.e.*, the use of a statutory right to exercise peremptory challenges for the purpose of discriminating against minorities)." (*Baricevic*, at p. 437.)  In our view, this approach effectively "confine[s] section 170.6 to its proper application without undermining the principal purpose of the section." (*Solberg, supra*, 19 Cal.3d at p. 206 (conc. & dis. opn. of Tobriner, Acting C. J.).)

We have long affirmed that section 170.6's "efficient and discreet procedure" (*Solberg, supra*, 19 Cal.3d at p. 204) is constitutional on its face. (Cf. *Superior Court v. County of Mendocino* (1996) 13 Cal.4th 45, 58–59 ["the Legislature generally may adopt reasonable regulations affecting a court's inherent powers or functions, so long as the legislation does not

'defeat' or 'materially impair' a court's exercise of its constitutional power or the fulfillment of its constitutional function"].) As we have explained, section 170.6 serves the laudatory goal of "insur[ing] confidence in the judiciary" (*Johnson*, *supra*, 50 Cal.2d at p. 697) by requiring only a *good faith belief* in a judge's prejudice, not proof of actual prejudice (*Solberg*, at p. 193). And while good faith challenges, particularly on a blanket basis, can interfere with court operations, they do not raise the same separation of powers concerns as bad faith challenges. Unlike bad faith challenges, good faith challenges are in step with the courts' duty to ensure the effective and efficient administration of justice because they properly guard against prejudice from judicial officers and thereby "avoid the suspicion which might arise from the belief of a litigant that the judge is biased in a case where it may be difficult or impossible for the litigant to persuade a court that his belief is justified." (*Johnson*, *supra*, 50 Cal.2d at p. 697.) We underscore that our opinion in no way restricts a litigant's right in a particular case to disqualify a judge whom he or she believes is "prejudiced" within the meaning of section 170.6, subdivision (a)(2). And a challenge to a judge under section 170.6, of course, remains distinguishable from a challenge to a judge "for cause" under section 170.1, which places the burden on the complaining party "to establish as a fact" that the challenged judge is biased or prejudiced against the party. (*Estate of Buchman* (1955) 132 Cal.App.2d 81, 104; see § 170.1.) Instead, pursuant to section 170.6, the movant "may establish [a judge's] prejudice . . . by affidavit or declaration under penalty of perjury, or an oral statement under oath, that the judge . . . is prejudiced[.]" (§ 170.6, subd. (a)(2).) Moreover, much like a prosecutor is presumed to exercise peremptory challenges to prospective

36

jurors in a constitutional manner (see *People v. Cleveland* (2004) 32 Cal.4th 704, 732), we presume that parties will not adopt bad faith blanket policies to disqualify judges under section 170.6.[9] (Cf. *Solberg, supra,* 19 Cal.3d at p. 197 [" 'We cannot properly assume that there will be a wholesale making of false statements under oath' "].)

Borrowing from *Batson*'s three-step process, the opponent of a section 170.6 motion must first timely object[10] to a section 170.6 motion and demonstrate a prima facie case that the motion's proponent is lodging bad faith blanket challenges against a particular judge. More specifically, the opponent of a section 170.6 motion must show " ' "that the totality of the relevant facts gives rise to an inference of [a bad faith blanket

---

[9] We also note that a person who files a false disqualification affidavit can be held in contempt. (Cf. *In re Ciraolo* (1969) 70 Cal.2d 389, 391 [upholding "an order of contempt . . . arising out of the filing . . . of a certain false disqualification affidavit" supporting removal for cause].)

[10] On the record here, petitioner raised an objection to County Counsel's motion, and we therefore have no occasion to consider whether a judge can sua sponte initiate an inquiry into the basis of a party's section 170.6 motions. (Cf. *Baricevic, supra,* 136 Ill.2d at p.438 ["First, the trial judge must determine whether there is prima facie evidence that the motions are being used in an effort to thwart the chief judge of the circuit court's independence in assigning cases to the judges in his circuit [and if the judge makes such a determination, a hearing should be conducted by a different judge]"].) At oral argument, petitioner's counsel resisted this approach, asserting that permitting a judge to initiate a prima facie inquiry into the basis for a party's section 170.6 motion could raise questions about improper judicial embroilment in a case. Any such considerations are beyond the scope of this opinion.

policy],"'" as opposed to a good faith belief that a judge is prejudiced in a specific case. (*People v. Armstrong* (2019) 6 Cal.5th 735, 766 (*Armstrong*).) Among the factors that may be considered in making this prima facie determination are whether the party has lodged persistent strikes against the same judge in all or a substantial portion of cases assigned to that judge, or all or a substantial portion of cases of a particular type. Such a showing may alone be persuasive in establishing a prima facie case of a bad faith blanket policy. As described below, the burden then "shifts to the [proponent] of the motion to give an adequate . . . explanation for the challenges." (*People v. Gutierrez* (2017) 2 Cal.5th 1150, 1158 (*Gutierrez*).)

While it is impossible to chronicle all the facts and circumstances that might combine to establish a prima facie case of a party's bad faith blanket policy to disqualify a particular judge, the relevant case law may provide some helpful insights. In *Tejeda*, for instance, the district attorney's challenges to Judge Goethals in murder cases increased dramatically in number following Judge Goethals's finding that the Orange County District Attorney's Office had engaged in misconduct in connection with the use of inmate informants. (See *Tejeda*, *supra*, 1 Cal.App.5th at pp. 897–898; see also *id.* at p. 898 [" 'For over three years, from December 7, 2010 through February 24, 2014, Judge Goethals was assigned 35 murder cases for trial and was disqualified once by the People. From February 25, 2014 through September, 2015, a period of [18] months, Judge Goethals was assigned 49 murder cases for trial and was disqualified 46 times by the People' "].) Such an uptick in challenges after an adverse ruling could evidence bad faith. Indeed, it is well established "that a judge's . . . prior rulings of law do not afford a proper basis for a claim of prejudice" under

section 170.6. (*Solberg*, *supra*, 19 Cal.3d at p. 205 (conc. & dis. opn. of Tobriner, J.).) Nor can a party move to disqualify "a judge because of his [or her] views on the law or on the exercise of judicial discretion." (*Solberg*, *supra*, 19 Cal.3d at p. 194.) It would also be improper for an office to have a written policy to always challenge a specific judge without a good faith belief that the judge was prejudiced. In *McCartney*, *supra*, 12 Cal.3d 512, for instance, there was evidence the public defender's office had a written policy to file section 170.6 affidavits of prejudice against a judge " 'on all trials' assigned to [him]," and later all " 'preliminaries, arraignments, bail settings and any other appearances which require an act of judicial discretion.' " (*McCartney*, at p. 538, fn. 13.) Or as in *Solberg*, it might very well be that a party "explicitly confirm[s] the existence of the 'blanket challenge' policy in his [or her] statement in open court." (*Solberg*, *supra*, 19 Cal.3d at p. 207 (conc. & dis. opn. of Tobriner, J.).)[11] As Justice Tobriner explained, it is not enough "[t]hat a party or attorney believes that a judge is likely to rule against his interests" based on the evidence in the case, " 'prejudice' . . . refer[s] to the mental attitude or disposition of the judge towards a party to the litigation" without regard to the evidence. (*Solberg*, *supra*, 19 Cal.3d at p. 205 (conc. & dis. opn. of Tobriner, J.).)

In the absence of a prima facie showing that a party's challenge to a particular judge is based on a bad faith blanket policy, the section 170.6 motion must be granted without further

---

[11] In citing these examples from *McCartney* and *Solberg*, we do not suggest that evidence of a formal written policy or explicit confirmation will always be required to support a finding of bad faith.

inquiry. If, however, "a *prima facie* case is found to exist, a hearing shall be conducted as soon as possible before a judge other than the judge named in the motion." (*Baricevic*, *supra*, 136 Ill.2d at p. 439.) At the hearing, " 'the "burden shifts to the [proponent of the section 170.6 motion] to explain adequately the [challenge]" by offering' " a good faith basis for its belief that the challenged judge is personally prejudiced against the party in the particular case. (*Armstrong*, *supra*, 6 Cal.5th at p. 766.) This means that the judiciary may now look behind the section 170.6 affidavit or oral statement and inquire into the basis for the party's challenges. "The judge named in the motion need not testify at the hearing, but [the judge] may submit an affidavit if [the judge] wishes." (*Baricevic*, at p. 439.) Consistent with section 170.6, "[t]he [proponent of the motion] need not prove that the judge is, in fact, prejudiced. Instead, the [party] must [establish] facts or circumstances related to the particular case at hand which [support a good faith belief] that the judge is prejudiced." (*Baricevic*, at p. 439.) "The inquiry is focused on whether the proffered . . . reasons [for believing the judge is prejudiced] are subjectively *genuine*." (*People v. Hardy* (2018) 5 Cal.5th 56, 76.) "To meet the second step's requirement, the [proponent] of the motion must provide 'a "clear and reasonably specific" explanation of his [or her] "legitimate reasons" for exercising the challenges.' (*Batson*, *supra*, 476 U.S. at p. 98, fn. 20.)" (*Gutierrez*, *supra*, 2 Cal.5th at p. 1158.)

"Third, if the [proponent of the section 170.6 motion] indeed tenders a[n] . . . explanation [for his or her belief that the judge is prejudiced in the particular case], the trial court must decide whether the [opponent of the challenge] has proven [a bad faith blanket policy]." (*Gutierrez*, *supra*, 2 Cal.5th at p. 1158.) In other words, if after considering the proffered basis

for the judge's removal within the larger context of the overall pattern of strikes against the judge, the judge finds the section 170.6 motion to have been made in bad faith, the trial court should deny the motion and the case will remain with the judge named in the motion.  If the trial court finds the party's allegations of prejudice to be made in good faith, it must grant the motion and reassign the case to a different judge than the judge named in the motion.  (Cf. *People v. Stanley* (2006) 39 Cal.4th 913, 936 [within the framework of *Batson*, trial courts consider a party's " ' " ' "explanation [for dismissing a juror] in light of the circumstances of the case" ' " ' " to determine whether the proffered reason is " ' "genuine" ' "].)[12]

## III.  DISPOSITION

Pursuant to *Solberg*, the trial court barred petitioner's objection to County Counsel's alleged blanket challenges to Judge Guy Castillo at the threshold, without consideration of petitioner's specific allegations, and the Court of Appeal summarily denied relief.  Given our departure from *Solberg*'s pertinent reasoning, we remand the cause to the Court of Appeal to consider whether any further proceedings are necessary in light of our opinion.

---

[12]  In its amicus curiae brief, the California Judges Association asserts that the only satisfactory remedy for blanket challenges is to bar, full stop, government attorneys from filing section 170.6 motions.  We agree with the parties that amicus curiae's proposed solution is too far-reaching and would amount to improper judicial legislating.  Of course, as we recognized in *Solberg*, the Legislature is free to amend section 170.6 as it deems "necessary or desirable." (*Solberg*, *supra*, 19 Cal.3d at p. 204.)

**GROBAN, J.**

**We Concur:**

**GUERRERO, C. J.**
**CORRIGAN, J.**
**LIU, J.**
**KRUGER, J.**
**EVANS, J.**
**BROWN, J.**[*]

---

[*] Presiding Justice of the Court of Appeal, First Appellate District, Division Four, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion**  J.O. v. Superior Court

_____

**Procedural Posture** (see XX below)
**Original Appeal**
**Original Proceeding**
**Review Granted (published)**
**Review Granted (unpublished)** XX Denial order filed 10/1/24 – 3d Dist.
**Rehearing Granted**

_____

**Opinion No.** S287285
**Date Filed:**  May 28, 2026

_____

**Court:**  Superior
**County:**  San Joaquin
**Judge:**  Kristine A. Eagle

_____

**Counsel:**

Judyanne D. Vallado, Public Defender, Janis D. Everett and Nelson C. Lu, Deputy Public Defenders, for Petitioner.

Marsanne Weese and Rose Mishaan for the Law Offices of Marsanne Weese as Amicus Curiae on behalf of Petitioner.

Charles M. Denton and Kathleen Guneratne, Public Defenders (Alameda), for the California Public Defenders Association as Amicus Curiae on behalf of Petitioner.

No appearance for Respondent.

Rosing Pott & Strohbehn and Heather L. Rosing for California Judges Association as Amicus Curiae on behalf of Respondent.

Edward J. Kiernan, County Counsel, Jonathan N. King, Chief Deputy County Counsel, and Claudine L. Sherron, Deputy County Counsel, for Real Party in Interest.

Gregg Totten; Dan Dow, District Attorney (San Luis Obispo), Richard J. Sachs, Deputy District Attorney; and Albert Locher, Assistant District Attorney (Sacramento), for the California District Attorneys Association as Amicus Curiae on behalf of Real Party in Interest.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Nelson C. Lu
Deputy Public Defender
102 South San Joaquin Street, Room 1
P.O. Box 201030
Stockton, CA 95201
(209) 468-2749

Jonathan N. King
Chief Deputy County Counsel
44 North San Joaquin Street, Suite 679
Stockton, CA 95202
(209) 468-2980

Richard J. Sachs
Deputy District Attorney
2495 Natomas Drive, Suite 575
Sacramento, CA 95833
(916) 443-2017